**KENTUCKY HEARTWOOD, INC., et al., Plaintiffs,**

v.

**Benjamin WORTHINGTON, et al., Defendants.**

**Civil Action No. 97–378.**

United States District Court, E.D. Kentucky.

June 18, 1998.

---

Jeffrey Brent Austin, Austin & Ward, Lexington, KY, Joe F. Childers, Robert T. Gallagher, Lexington, KY, for Kentucky Heartwood, Inc., Heartwood, Inc., plaintiffs.

Jane E. Graham, U.S. Attorney's Office, Lexington, KY, Lois J. Schiffer, U.S. Department of Justice, Environment & Natural Resources Div., Washington, DC, Kelly E. Mofield, Lisa Holden, U.S. Department of Justice, Environment & Natural Resources, Washington, DC, Andrew A. Smith, Kenneth E Kellner, U.S. Department of Justice, Environmental & Natural Resources Div., Washington, DC, for Benjamin Worthington, Elizabeth Estill, United States Forest Service, Department of Agriculture, defendants.

Wayne F. Collier, Kinkead & Stilz, Lexington, KY, for Kentucky Forest Industries Ass'n, Inc.

## OPINION AND ORDER

FORESTER, District Judge.

### I. INTRODUCTION

On September 5, 1997, plaintiffs filed a verified complaint in the U.S. District Court for the Eastern District of Kentucky. Plaintiffs, Kentucky Heartwood Inc. ("Kentucky Heartwood") and Heartwood Inc. ("Heartwood"), are non-profit corporations organized for protecting biodiversity and ecosystem integrity on public and other forested land in Kentucky and the central hardwood region. In their civil action for declaratory and injunctive relief, plaintiffs name as defendants the U.S. Forest Service, Department of Agriculture ("Forest Service"), and employees and agents of the same in their official capacities, to wit, Benjamin Worthington, Forest Supervisor for the Daniel Boone National Forest ("Daniel Boone Forest") and Elizabeth Estill, Regional Forester for the Southern Region. Plaintiffs seek declaratory and injunctive relief to prevent the Forest Service from proceeding with logging on the

Daniel Boone Forest until the Forest Service complies with the applicable law and administrative regulations.[1]

The Court allowed Kentucky Forest Industries Association, Inc. ("KFIA") to intervene. KFIA is a Kentucky non-profit corporation having as its primary purpose the timber industry in general and more specifically the support of its members, many of whom operate mills and other businesses that depend in whole or in part upon the timber harvested pursuant to timber contracts granted by the Forest Service to various stands of timber within the Daniel Boone Forest.

## II. FACTUAL BACKGROUND

### A. The Daniel Boone Forest

The Daniel Boone Forest is located in Eastern Kentucky and contains nearly two million acres. Of the vast body of land, 669,379 acres are federally owned lands managed by the Forest Service.

> The proclaimed boundaries of the Daniel Boone form a narrow strip of land 140 miles long on the western edge of the Cumberland Plateau; the Redbird Purchase Unit lies in the eastern portion of the Plateau. As is characteristic of many National Forests in the East, the Daniel Boone is not circumscribed as one large unit of ownership and its Districts are separated geographically from each other.

*Introduction of the Forest Plan,* at I–3–4.

The rugged topography of the Daniel Boone Forest, which lay above sedimentary rocks formed from sand, silt, and clay, as well as limestone laced with coal pockets, is cut by the Licking, Kentucky, and Cumberland Rivers and their respective off-shooting streams and bodies of still water. *Management Situation of the Forest Plan,* at II–1–2. The "climate of the [Daniel Boone Forest] is temperate with moderately cold winters and warm, humid summers[, with precipitation] fairly well distributed throughout the year." *Id.* at II–3.

The deciduous forest is home to a wide variety of trees which compose the overstory of the forest, to-wit, Northern Red Oak, Red Oak, Black Oak, Scarlet Oak, Southern Red Oak, Basswood, Beech, Yellow Poplar, Sugar Maple, Birch, Red Maple, Hemlock, White Oak, Hickories, Short Leaf Pine, Pitch Pine, Table Mountain Pine, Loblooy Pine, American Chestnut, Chestnut Oak, Virginia Pine, as well as many noncommercial trees and shrubs. *Id.* at II–4–5. The understory of the forest is comprised of Rhododendron, Fern–Ephemerals, Mountain Laurel, Blueberry, Huckleberry, Dogwood, Sourwood, Black Gum, as well as White Goldenrod and Canadian Yew. *Id.* at II–5.

Within the forest the following fauna can be found: Eastern Chipmunk, Southern Flying Squirrel, Deer Mouse, various species of bats, Spotted Skunk, Eastern Woodrat, and Eastern Bobcat. *Id.* The species of birds which reside in the forest vary; the most common include: Warblers, Flycatchers, Ovenbird, American Restart, Yellow–Throated Vireo, Pin Warbler, Scarlet Tanager, Red–Cockaded Woodpecker, Ruffed Grouse, Black–Billed Cuckoo, Black–Throated Warbler, and Pine Warbler. *Id.* Additionally, the forest is home to various amphibians and reptiles including, Lungless Salamanders, Broadhead Skink, Box Turtle, Pine Snake, Green Salamander. *Id.* Within the waters in the forest live various species of non-game fish as well as gaming fish including, Rainbow Trout, Muskie, Largemouth Bass, Smallmouth Bass, Bluegill, Crappie, and Catfish. *Id.* at II–16. In season, sportspersons hunt White–Tailed Deer, Wild Turkey, Squirrel, Quail, Ruffed Grouse, Rabbit, Woodcock, Fox Raccoon, and Dove, which also live in the forest. *Id.* at II–15.

At the time of the adoption of the 1985 Forest Plan for the Daniel Boone Forest, fifteen (15) federally listed endangered or threatened species of plants and animals were known to exist in counties covered by the Daniel Boone Forest. *Plaintiffs' Reply*

---

**1.** Plaintiffs allege that defendants have violated or failed to adhere to procedures set forth in the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.;* the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.;* and the

National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 *et seq.* Plaintiffs bring their claims pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 706.

to *KFIA's Response to Plaintiffs' Motion for a Preliminary Injunction,* at p. 2. These species include: Indiana Bat, Gray Bat, Virginia Big–Eared Bat, Eastern Cougar, Bald Eagle, Peregrine Falcon, Red–Cockaded Woodpecker, Appalachian Monkeyface Pearly Mussel, Cumberland Bean Pearly Mussel, Dromedary Pearly Mussel, Tan Riffleshell, Yellow–Blossom Pearly Mussel, Orange–Footed Pearly Mussel, Pink Mucket Pearly Mussel, and Rough Pigtoe. *Id.* at p. 4. Since 1985, eighteen (18) new species of plants and animals have been added to the federal list of endangered or threatened species in counties within the Daniel Boone Forest. *Id.* at p. 2. These species include: Running Buffalo Clover, Blackside Dace, Cumberland Sandwort, White–Haired Goldenrod, Little–Wing Pearly Mussel, Cracking Pearly Mussel, Ring Pink, Virginia Spiraea, Fanshell, Purple Cats Paw Pearly Mussel, Cumberland Rosemary, American Chaffseed, Northern Riffleshell, Clubshell, Palezone Shiner, Cumberland Combshell, Oyster Mussel, and Cumberland Elktoe. *Id.* at p. 2–3.

In addition to being the home of the above-listed flora and fauna, the Daniel Boone Forest offers a wide spectrum of recreational opportunities, to-wit, primitive to luxury camping, hiking 536 miles of trails, rock climbing, bicycling, hunting, picnicking, geological area viewing, boating, sailing, water skiing, and fishing. *Management Situation of the Forest Plan,* at II–18.

### B. The Management of the Daniel Boone Forest

The Daniel Boone Land and Resource Management Plan ("the Forest Plan") was adopted in 1985, along with its accompanying Environmental Impact Statement ("EIS"), and has been used as the primary document governing the management of the Daniel Boone Forest.[2] Of course, the management of the forest is also subject to federal environmental laws, to-wit: the ESA, the NFMA, and the NEPA. Plaintiffs have never formally challenged the Forest Plan itself, but they have filed numerous administrative complaints as well as several law suits contesting individual timber sales awarded pursuant to the Forest Plan.

■ A Forest Plan "must establish the overall management direction for the forest unit for ten to fifteen years. Thus, a [Forest Plan] is, in essence, a programmatic statement of intent that establishes basic guidelines and sets forth the planning elements that will be employed by the Forest Service in future site-specific decisions." *Sierra Club v. Robertson,* 28 F.3d 753 (8th Cir.1994). The Forest Plan at bar states that it "will be reviewed (and updated if necessary) at least every five years [and that it] will be revised on a ten-year cycle." *Preface of the Forest Plan,* at i. To date, it has been amended nine times since its adoption. Moreover, defendants have adopted three policies, the Cliffline Management Policy, the Shelterwood Policy, and the Indiana Bat Management Strategy, but have not amended the same to the Forest Plan.

Pursuant to the NFMA[3], the directives of the Forest Plan itself, and apparently due to the outcome of previous litigation before this Court, to-wit, *House v. United States Forest Service,* Civil Action No. 96–446, published at 974 F.Supp. 1022 (E.D.Ky.1997), the federal defendants are currently in the process of drafting a new Forest Plan for the Daniel Boone Forest to be adopted in late 1998 or early 1999. During the amendment process, the Forest Service has stated that it will not offer or award any new commercial timber sales that utilize any of the management policies being properly amended to the For-

---

2. The NFMA directs the Secretary of Agriculture to "develop, maintain, and as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). *See also,* 16 U.S.C. § 1600–14. Said plan must be accompanied by an EIS. 36 C.F.R. § 219.10(b). In constructing the Forest Plan, the Forest Service must comply with multiple concurrent statutes and/or regulations that the NFMA incorporates by reference.

3. Pursuant to the NFMA, 16 U.S.C. § 1604(f)(5), a National Forest is to undertake periodic comprehensive review and revision of its Forest Plan to ensure that it is consistent with current contemplated uses of the Forest as well as laws that protect the environment and conserve listed species.

est Plan. The federal defendants submit that once the amendment process is complete, the Forest Service will voluntarily enter into con-sultations with Fish & Wildlife on the entire Forest Plan as amended.

Apparently as a result of the filing of this lawsuit in conjunction with the outcome of previous litigation, the Forest Service re-viewed the 37 timber sale projects imple-mented in the Daniel Boone Forest to deter-mine their status and to assess the adequacy of the site-specific environmental analysis and documentation of the same. The out-come of this endeavor yielded the cancella-tion of thirteen of the sales because the Forest Service determined that the site-spe-cific environmental analysis or documentation was inadequate in some regard. Of the re-maining scheduled sales, fourteen are near closure or are closed,[4] and ten are currently being implemented.

## III. STATUTORY FRAMEWORK

Before reviewing the merits of plaintiffs' claims, the Court finds that it would be help-ful to review the statutory framework under-lying plaintiffs' action.

### A. The Endangered Species Act, 16 U.S.C. § 1531 *et seq.*

As indicated by its name, the ESA, enact-ed in 1973, was passed for the purpose of "provid[ing: (1) ] a means whereby the eco-systems upon which endangered species and threatened species depend may be con-served[; and (2) ] a program for the conser-vation of such endangered species and threatened species." 16 U.S.C. § 1531(b).[5] The key term in the ESA, "conservation", means "to use and the use of all methods and procedures which are necessary to bring any

endangered species or threatened species to the point at which the measures provided pursuant to [the Act] are no longer neces-sary." 16 U.S.C. § 1532(3).

One of the foundational premises of the ESA, 16 U.S.C. § 1536(a)(2), provides:

Each Federal agency shall, in consultation with and with the assistance of the Secre-tary, insure that *any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued exis-tence of any endangered species or threat-ened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secre-tary, after consultation as appropriate with affected States, to be critical,* unless such agency has been granted an exemp-tion for such action by the Committee pur-suant to subsection (h) of this section. In fulfilling the requirements of this para-graph each agency shall use the best scien-tific and commercial data available.

*Id.* (emphasis added).[6] In short, the ESA attempts to insure the continued existence of endangered and threatened species.

The ESA mandates that defendants place conservation above any of the agency's com-peting interests. The Supreme Court, in *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), found that,

[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost .... [T]he legislative history un-dergirding Sec. 7 reveals an explicit con-gressional decision to require agencies to afford first priority to the declared na-tional policy of saving endangered spe-cies. The pointed omission of the type of

---

**4.** Closure means that timber cutting is complete; what follows is vegetation and erosion control measures and the removal of any remaining cut timber.

**5.** The Secretary of the Interior has the authority to designate species as endangered or threat-ened. 16 U.S.C. § 1533(a). As stated previous-ly, the fifteen species were listed on the endan-gered or threatened species list in 1985 when the Forest Plan was adopted; since that date, eigh-

teen species have been added to the endangered or threatened species list.

**6.** To assist agencies in complying with its duty not to jeopardize the continued existence of en-dangered species or said species habitat, the ESA and its implementing regulations set out an ex-tensive and detailed consultation process de-signed to provide agencies with expert advice in determining the biological impacts of their pro-posed activities. 16 U.S.C. § 1536(b). *See e.g.,* 50 C.F.R. § 402, *et seq.*

qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the "primary missions" of federal agencies.... [T]he plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as "incalculable."

*Id.* at 2297, 98 S.Ct. 2279. *See also,* 16 U.S.C. § 1531(c)(1) ("all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purpose of this chapter.")

With conservation as its goal, the ESA provides a procedural framework to follow for those who desire to tamper with the environment. It is defendants' alleged failure to abide by the consultation process in drafting the Forest Plan and the amendments and adoptions thereto with which plaintiffs take issue.

■ The procedural framework is as follows. An agency proposing an action must first determine whether the action "may affect" listed species. 16 U.S.C. § 1536; 50 C.F.R. §§ 402.11 and 402.14. How this determination is made is left up to the agency. If an agency determines that its actions "may affect" a protected species or its habitat, then that agency must enter into consultation with Fish & Wildlife to ensure that the proposed actions are not likely to jeopardize the continued existence of any listed species. 50 C.F.R. § 402.14.[7] There are two forms of consultations: formal and informal.[8] The agency may either enter into formal consultation with Fish & Wildlife or engage in informal consultation to determine whether formal consultation is appropriate or necessary. 50 C.F.R. §§ 402.13, 402.14(a), (b). If during informal consultation, the agency and Fish & Wildlife concur in writing that the proposed action is "not likely to adversely affect" a protected species, then the consultation process is complete and formal consultation is unnecessary. *Id.* Additionally, if it is agreed that the action will not adversely affect a protected species, then Fish & Wildlife does not have to prepare a biological opinion. On the other hand, if, during informal consultation, the agency determines that its actions may have an adverse effect on a protected species, then the agency must request initiation of formal consultation with Fish & Wildlife. Moreover, if formal consultation is required, then a biological opinion by Fish & Wildlife is required to advise the agency whether jeopardy is likely to occur and, if so, whether reasonable and prudent alternatives exist to avoid a "jeopardy" situation. *Id. See also, Bennett v. Spear,* 520 U.S. 154, 159, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

This consultation obligation is on-going and continuing. 50 C.F.R. § 402.16.[9] Specifically, whenever a new species is listed, the agency is required to reinitiate consultation. *Id.*

### B. The National Forest Management Act, 16 U.S.C. § 1600 *et seq.*

The Multiple–Use Sustained–Yield Act ("Multiple–Use Act") of 1960 provides that

---

7. If the agency determines that its proposed actions will have "no effect" on protected species, then consultation is not required unless the director of Fish & Wildlife specifically requests consultation with the agency. 50 C.F.R. § 402.14(a).

8. The purpose of the consultation requirements of the ESA is to allow an agency to avail itself of "the expertise of Fish & Wildlife in assessing the impact of the proposed project and the feasibility of adopting reasonable alternatives." *Lone Rock Timber Co. v. United States Department of Interior,* 842 F.Supp. 433, 440 (D.Or.1994).

9. The relevant regulation states:

Reinitiation of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:

a) If the amount or extent of taking specified in the incidental take statement is exceeded;

b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

d) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16.

the Forest Service manage the National Forests for outdoor recreation, range, timber, watershed, and wildlife and fish purposes under the balance the agency deems will "best meet the needs of the American people [and] mak[e] the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions" 16 U.S.C. § 531(a). Moreover, the Multiple–Use Act provides that the Forest Service shall use "some land . . . for less than all of the resources [and that the Forest Service will promote] harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output." *Id.* Furthermore, the Multiple–Use Act provides that the Forest Service shall manage the National Forests so as to provide a sustained yield of various renewable resources of the national forest without impairment of the productivity of the land resources. 16 U.S.C. §§ 528 and 531(b). Here, in attempting to give all citizens a crumb, Congress has made it quite easy for groups at either end of the spectrum to impose their minority views upon the entire majority, an abomination of the democratic process. Nevertheless, the Court must follow the word of Congress.

The principles, goals, and mandates of the Multiple–Use Act are incorporated in the NFMA, promulgated in 1976, which is set forth in 16 U.S.C. § 1600 *et seq.* 16 U.S.C. § 1604(e); 36 C.F.R. § 219.1(b)(1). The NFMA establishes a statutory framework for the National Forest System and directs the development of Land and Resource Management Plans. 16 U.S.C. § 1604(a)("As part of the Program provided for by section 4 of this Act, the Secretary of Agriculture shall develop, maintain, and, as appropriate, revise land and resource management plans (LRMPs) for units to the National Forest System, coordinated with the land and resource management planning processes of State and local governments and other Federal agencies.") The statute directs the Secretary of the Department of Agriculture to use a systematic, interdisciplinary approach to forest planning so as to achieve integrated consideration of physical, biological, economic, and other sciences. 16 U.S.C. § 1604(b). The NFMA requires the Forest Service to prepare "one integrated plan for each unit of the National Forest System, incorporating in one document or one set of documents, available to the public at convenient locations, all of the features required by this section." 16 U.S.C. § 1604(f)(1).

Additionally, the NFMA provides for public participation in this forest planning process. 16 U.S.C. § 1604(d).[10] This is one NFMA provision that plaintiffs claim defendants have violated. The NFMA requires that the Secretary of Agriculture "promulgate regulations under the principles of the Multiple–Use Sustained–Yield Act of 1960, that set out the process for the development and revision of the land management plans, and the guidelines and standards prescribed by this section." 16 U.S.C. § 1604(g). The statute further provides that said "guidelines for land management plans developed to achieve the goals of the Program which insure research on and (based on continuous monitoring and assessment in the field) evaluation of the effects of each management system to the end that it will not produce substantial and permanent impairment of the productivity of the land."

Under the NFMA, Forest Plans must be periodically revised and may be "amended in any manner whatsoever." 16 U.S.C.

---

**10.** The relevant statute provides:

Public participation in management plans; availability of plans; public meetings.

The Secretary shall provide for public participation in the development, review, and revision of land management plans, including, but not limited to, making the plans or revisions available to the public at convenient locations in the vicinity of the affected unit for a period of at least three months before final adoption, during which period the Secretary shall publicize and hold public meetings or comparable processes at locations that foster public participation in the review of such plans or revisions.

16 U.S.C. § 1604(d).

§§ 1604(f)(4) and (f)(5).[11] Implementing regulations state:

**Amendment.**

The Forest Supervisor may amend the forest plan. Based on an analysis of the objectives, guidelines, and other contents of the forest plan, the Forest Supervisor shall determine whether a proposed amendment would result in a significant change in the plan. If the change resulting from the proposed amendment is determined to be significant, the Forest Supervisor shall follow the same procedure as that required for development and approval of a forest plan. If the change resulting from the amendment is determined not to be significant of the purposes of the planning process, the Forest Supervisor may implement the amendment following appropriate public notification and satisfactory completion of NEPA procedures.

36 C.F.R. § 219.10(f). This is the second NFMA provision with which plaintiffs take issue.

In *House v. U.S. Forest Service*, 974 F.Supp. 1022, the plaintiffs argued that defendants violated the NFMA by adopting three policies which were and which have not been formally merged into the ten-year Forest Plan for the Daniel Boone Forest, as the three policies were and have not been subjected to public comment and scrutiny.

Plaintiffs also argued that in actuality, said policies were "amendments" to defendants' standing Forest Plan, and that if it was determined that said amendments were "significant", then defendants failed to jump through the public notice hoops as required by the NFMA.[12]

The Court found that the three policies did more than merely clarify the standards and guidelines within the Forest Plan; the Court found that the three policies provided additional guidelines, and as such were subject to the notice and comment procedures set forth in the NFMA and the NEPA. Thus, the Court ruled that the policies may not be implemented until the Forest Plan has been properly amended to include the same. However, the Court limited its holding to the Forest Plan and the three adopted policies only as they pertain to the Leatherwood Fork sale, the subject of the previous litigation. Finally, plaintiffs argue that federal defendants have violated the NFMA, which permits the use of even-age management, but does not permit the exclusive use of it, by solely using even-aged management.[13]

**C. The National Environmental Policy Act, 42 U.S.C. § 4332 *et seq.***

The NEPA was promulgated, in part, to focus the attention of the government and

---

11. The plans are amended pursuant to 16 U.S.C. §§ 1604(f)(4) and (5), which provide:

Plans developed in accordance with this section shall
(4) be amended in any manner whatsoever after final adoption after public notice, and if such amendment would result in a significant change in such plan, in accordance with provisions of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section; and
(5) be revised (A) from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years, and (B) in accordance with the provision of subsections (e) and (f) of this section and public involvement comparable to that required by subsection (d) of this section.
16 U.S.C. §§ 1604(f)(4) and (5).

12. Defendants are required to provide public participation before adoption new policies. *See* 16 U.S.C. § 1604(d) ("The Secretary shall pro-

vide public participation in the development, review, and revision of land management plans...."). Moreover, 40 C.F.R. § 1500.1(b) provides, "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken ... [as] ... public scrutiny [is] essential to implementing NEPA." *See also, Sierra Club v. Marita*, 46 F.3d 606, 608 (7th Cir.1995) (held "the Forest Service must develop its management plans in conjunction with ... extensive public participation and comment ...").

13. There are two types of logging: even-aged management and uneven-aged management. Even-aged management consists of clear cutting (removal of all the trees) and its variants by the deferred shelterwood method, the clear cutting method and the seed tree cutting method. Uneven-aged management consists of individual tree selection where only 10–20% of the individual trees are removed from the forest or group selection where 10–20% of the trees are removed in small groups.

the public on a proposed action, so that the consequences of the action can be studied before it is implemented. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Michigan v. United States*, 994 F.2d 1197, 1199 (6th Cir.1993)(held the purpose of the Act is to ensure that federal agencies are aware of the environmental impact of their actions). The NEPA applies only to "major federal actions significantly affecting the quality of human environment." 42 U.S.C. § 4332(2)(C). The NEPA created the Council on Environmental Quality ("The Council") to provide guidance on agency compliance with the NEPA. 42 U.S.C. §§ 4341–4347.

In order to comply with the NEPA, before an agency may undertake a "major federal action [which would] significantly affect[ ] the quality of the human environment," like drafting a Forest Plan, the agency must prepare an Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332(2)(C).[14] *See also,* 40 C.F.R. §§ 1502.3—1502.18. However, despite this mandate, if after a careful examination through an Environmental Assessment ("EA"),[15] it is determined that the action would not be "significant," then an EIS is not necessary. 40 C.F.R. § 1507.3(b)(2). *See also, Forest Service Handbook* 1909.15, Chapter 40. Thus, at the conclusion of the EA, the Forest Service prepares either a Finding of Significant Impact, a Finding of No Significant Impact ("FONSI"), 40 C.F.R. § 1508.13, or an EIS, 40 C.F.R. § 1508.11. Throughout this process, "all environmental information [collected must be made] available to public officials and citizens before decisions are made and before actions are

14. Said statute provides in pertinent part:

(2) all agencies of the Federal Government shall-

. . . . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on-
(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332.

It is defendants' alleged failure to really investigate and consider alternatives to even-age management that plaintiffs challenge. See 40 C.F.R. § 1502.14, which provides:

**Alternatives including the proposed action.**
This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision maker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.
(c) Include reasonable alternatives not within the jurisdiction of the lead agency.
(d) Include the alternative of no action.
(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.
(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

40 C.F.R. § 1502.13.

15. "Environmental Assessment":

(a) Means a concise public document for which a Federal agency is responsible that serves to:
(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. .
(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.
(3) Facilitate preparation of a statement when one is necessary.
(b) Shall include brief discussion of the need for the proposal, of alternatives, . . . of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

40 C.F.R. § 1508.9.

taken. [Said] information must be of high quality. [Furthermore] accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. §§ 1500.1(b).

## IV. PLAINTIFFS' CLAIMS AND PRAYER FOR RELIEF

In sum, plaintiffs' claims are four-fold. First, plaintiffs claim that defendants have violated the ESA by not formally consulting with Fish & Wildlife on projects and plans such as the Forest Plan, the nine amendments thereto, and the three adopted policies thereto, as such projects authorized under that Plan may affect listed endangered, threatened, or sensitive species. Plaintiffs submit that the ESA provides that consultation is an on-going and continuing obligation and thus should have been done before implementing the Forest Plan, at the times the plan was amended, at the times the policies were adopted, and when each new species was added to the endangered or threatened species list. Plaintiffs argue that formal consultation is needed with respect to all pending and future harvests because the harvests may affect the listed endangered species.

Second, plaintiffs challenge the Forest plan by asserting that the Forest Plan's exclusive use of even-aged management violates the NFMA, which plaintiffs contend permits the use of even-age management, but does not provide for the exclusive use thereof.

Third, plaintiffs allege that the failure of the Forest Service to consider alternatives to even-age management of the Daniel Boone Forest when drafting the Forest Plan violates the NEPA, which requires defendants to study, develop, and describe appropriate alternatives for the Forest Plan Environmental Impact Statement ("EIS"). In short, plaintiffs argue that the Forest Service only pays lip service to uneven-age management, when the statute requires it consider it as a viable option.

Finally, plaintiffs contend that the defendants' failure to adopt policies as official Forest Plan amendments violate the NFMA.

Plaintiffs argue that the policies from which the Forest Service are working are not official amendments to the Forest Plan and therefore cannot be acted upon to manage the forest.

Plaintiffs demand that this Court vacate the Daniel Boone Forest Plan and the EIS that accompanied the Forest Plan pursuant to its authority under the APA, because the same were illegally adopted in violation of the ESA, the NFMA, and the NEPA. Plaintiffs request that all on-going, planned, and future projects that are likely to adversely affect a listed species be stayed until defendants complete a formal consultation with Fish & Wildlife and then properly amend and/or adopt a Forest Plan and an EIS that complies with the NFMA, the NEPA, and the ESA. Plaintiffs request that this Court declare null and void the decision authorizing the timber sales listed in exhibit 1, which names 37 sales.[16] Further, plaintiffs move the Court to require defendants to serve actual notice of such injunction on all contractors who have been awarded timber removal contracts or are engaged in cutting timber. Finally, plaintiffs request costs and attorney's fees under the Equal Access to Justice Act, Fed.R.Civ.P. 54, and/or Section 11 of the ESA.

## V. DEFENDANTS' POSITION

Defendants submit that the Court cannot consider the substantive portion of plaintiffs' motion for a preliminary injunction, as plaintiffs are barred from bringing their claims pursuant to the ESA, the NEPA, and the NFMA, because (1) said claims are not ripe for review, (2) plaintiffs lack standing, (3) plaintiffs have failed to exhaust the administrative remedies available to them, (4) plaintiffs failed to bring said claims within the applicable statute of limitations, and (5) the doctrine of laches prohibit plaintiffs from bringing said claims at this date. However, even assuming the Court does consider the substantive portion of plaintiffs' motion for injunctive relief, defendants argue that plaintiffs cannot sustain their burden because plaintiffs cannot prove that defendants' ac-

16. To date, the Forest Service canceled thirteen of the scheduled 37 timber sales, fourteen of the original sales are in closing status, and ten of the timber sales are active.

tions will definitely harm any listed endangered or threatened species. Defendants contend that procedural violations of the ESA, the NEPA, and the NFMA, simply are not enough to sustain a motion for a preliminary injunction.

## VI. PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Currently pending before the Court is plaintiffs' motion for a preliminary injunction. Defendants have filed their response to the same and plaintiffs have filed their reply thereto. Thus, this matter has been fully briefed and is ripe for review. Additionally, on April 15, 1998, the Court held a hearing regarding the same at which all parties were duly represented.

Before the Court addresses the meat of plaintiffs' motion, it must first examine a few preliminary issues, to-wit, justiciability and jurisdiction.

### A. Preliminary Issues

### 1. *Justiciability*

#### a. *ripeness*

■ The "basic rationale" of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."

*Sierra Club v. Marita*, 46 F.3d at 614, *citing Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *abrogated on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). On May 18, 1998, the United States Supreme Court vacated and remanded the Sixth Circuit's decision in *Sierra Club v. Thomas*, 105 F.3d 248 (6th Cir. 1997). *Ohio Forestry Association, Inc. v. Sierra Club,* — U.S. —, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). In short, in *Sierra Club v. Thomas*, the Sixth Circuit held disputes over forest planning are ripe upon the enactment of the Forest Plan, and thus, that

plaintiffs need not wait until site-specific action occurs to challenge the overall plan. The Supreme Court turned the Sixth Circuit's holding with respect to this issue on its head. The High Court stated that in determining ripeness, courts must examine "both the 'fitness of the issues for judicial decision' and the 'hardship to the parties of withholding court consideration.'" *Ohio Forestry Inc. v. Sierra Club*, 118 S.Ct. at 1670, *quoting, Abbott Laboratories v. Gardner*, 387 U.S. at 149, 87 S.Ct. 1507. Hence, the Supreme Court held that to accomplish the aforementioned, courts must consider:

(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.

*Id.* In applying the three-part test to plaintiffs' challenge to the Wayne National Forest Plan, with respect to the first prong, the Court found that withholding judicial consideration at the present would not cause the plaintiffs "significant hardship," as the Forest Plan does not command action or inaction. The Court proposed that the proper time for plaintiffs to file a complaint is closer in time to the actual logging phase, to-wit, when the Forest Service plans to harvest a specific site. *Id.* With respect to the second prong of the test, the Court found that judicial intervention would inappropriately interfere with further administrative action, in that challenges to the Forest Plan would hamper the Forest Service's efforts to revise and refine its policies as provided for by Congress. *Id.* at 1671. Finally, with respect to the third prong of the test, the Court found that review of Forest Plans "would require time-consuming judicial consideration of the details of an elaborate, technically based plan, which predicts consequences that may affect many different parcels of land in a variety of ways, and which effects themselves may change over time." *Id.* at 1671–1672. Accordingly, the Court concluded that courts would benefit not only from further factual development of the issues presented, but also from a narrowing of the issues that focusing

on one single logging proposal would afford. *Id.* Thus, the Supreme Court concluded that challenges to the content of Forest Plans under the NFMA are not justiciable. *Id.* (noting that "Congress has not provided for pre-implementation judicial review of Forest Plans" unlike it has for plans promulgated pursuant to the Toxic Substances Control Act, the Surface Mining Control Reclamation Act of 1977, the Resource Conservation and Recover Act of 1976, the Clean Air Act, and the Outer Continental Shelf Lands Act).

■ In light of the High Court's recent decision, this Court must find that plaintiffs' claim challenging the content of the Forest Plan pursuant to the NFMA is not yet ripe for review. *Id. See also, Wilderness Society v. Alcock,* 83 F.3d 386, 389–90 (11th Cir.1996)(holding that because "no site-specific action will be taken pursuant to the [Forest] Plan without a second stage of decision making," plaintiffs must wait until the site-specific action is taken before raising their claims); *Sierra Club v. Robertson,* 28 F.3d 753, 759–60 (8th Cir.1994). Accordingly the Court shall dismiss plaintiffs' NFMA claim related to plaintiffs' assertion that said Act does not provide for the exclusive use of even-age management.

■ However, because plaintiffs' claim brought pursuant to the NEPA is ripe for judicial review, the Court shall entertain the same. *See, Ohio Forestry Association, Inc. v. Sierra Club,* 118 S.Ct. at 1672 (distinguishing the NEPA from the NFMA, in that the former requires a particular procedure, whereas the latter requires a particular result, and stating, "A person ... who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper."). Applying the rational set forth at the close of *Ohio Forestry Assoc., Inc. v. Sierra Club,* the Court finds that plaintiffs' ESA claim and remaining NFMA claim as it relates to defendants' failure to comply with a particular procedure, to-wit, to adopt the three policies as official amendments, are also ripe for review. *Id.*

### b. standing

■ As the Court has previously found that plaintiffs' claim challenging the Forest Plan's alleged exclusive use of even-age management brought pursuant to the NFMA must be dismissed, the Court considers standing only as to plaintiffs' remaining claims brought pursuant to the ESA, the NEPA, and the NFMA.

To establish constitutional standing, a plaintiff first must first suffer an injury-in-factthat is (1) concrete and particularized, and (2) actual or imminent, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Second, the injury must be fairly traceable to the defendant's conduct. *Id.* at 560–561, 112 S.Ct. 2130. Third, the injury must be redressable by the court. *Id.* at 561, 112 S.Ct. 2130.

*Sierra Club v. Thomas,* 105 F.3d at 250, *vacated and remanded on other grounds, Ohio Forestry Association, Inc. v. Sierra Club, Inc.,* —— U.S. ——, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). *See also, Bennett v. Spear,* 117 S.Ct. at 1161–1163.

With respect to the first prong of the aforementioned test as applied to plaintiffs' ability to bring ESA, NEPA, and NFMA claims, the Court finds that the injury in fact suffered by plaintiffs who dedicate themselves to preserving the environment for all and who themselves enjoy the Daniel Boone Forest, is that due to defendants' actions and/or inactions, certain endangered species may imminently be in harms way. The species' demise would definitely spoil plaintiffs' cause as well as hamper plaintiffs' ability to enjoy the Daniel Boone Forest. Thus, the Court finds that plaintiffs have satisfied the first prong of the standard.

The Court finds that the plaintiffs also satisfy the second prong of the test. The injury, the possible destruction of various forms of endangered plant and wildlife, is traceable to the defendants' conduct, to-wit, (1) defendants' alleged failure to employ formal consultation when drafting and/or adopting certain management policies which may effect the environment, (2) defendants' alleged failure to consider alternatives to even-

age management when drafting the Forest Plan, and (3) defendants' alleged failure to adopt policies as official Forest Plan amendments.

Finally, the Court finds that plaintiffs meet the last prong of the test. The injury may be redressed by the Court *via* the granting of injunctive relief.

■ Accordingly, the Court finds that plaintiffs meet all three prerequisites listed above and fall within the boundaries of the zone of interest test. Thus, plaintiffs have standing to pursue their ESA, NEPA, and remaining NFMA claims.

Next the Court must consider whether it has jurisdiction to hear plaintiffs' claims.

### 2. Jurisdiction

#### a. exhaustion of administrative remedies

■ Plaintiffs challenge the Forest Plan [17] by asserting violations of the ESA, the NEPA, and the NFMA. Plaintiffs bring said claims pursuant to the APA, 5 U.S.C. § 701 *et seq.*. In general, "[c]ourts have long required a litigant seeking review of agency action to exhaust available administrative remedies prior to seeking judicial review." *Sharps v. United States Forest Service*, 28 F.3d at 853–54. *See also, United States v. Haun*, 124 F.3d 745 (6th Cir.1997). However, the judicial doctrine of exhaustion of administrative remedies must yield to the statutory pronouncement of that doctrine in section 10(c) of the APA, 5 U.S.C. § 704. *Darby v. Cisneros*, 509 U.S. 137, 146, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). Said section provides in pertinent part:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.... Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, *unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.*

5 U.S.C. § 704 (emphasis added). Accordingly, "where the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review only when expressly required by statute or when an agency rule requires appeal before review...." *Darby v. Cisneros*, 509 U.S. at 154, 113 S.Ct. 2539.

The Court looks at each statute on which plaintiffs base their claims in turn to determine whether said statutes expressly require the exhaustion of administrative remedies prior to judicial review of an agency action.

■ With respect to the ESA, the Court finds that the exhaustion of administrative remedies is not a mandatory precondition to filing suit for a violation of the ESA. The only jurisdictional prerequisite to filing suit under the ESA is that a movant must provide a future defendant with written notice sixty (60) days prior to the filing of a lawsuit. 16 U.S.C. § 1540(g)(2)(A). *See also, Save the Yaak Committee v. Block*, 840 F.2d 714, 721 (9th Cir.1988). The purpose of the sixty (60) day notice requirement is to give the offending agency an opportunity to cure the alleged illegality. *Forest Conservation Council v. Espy*, 835 F.Supp. 1202 (D.Idaho 1993), *aff'd*, 42 F.3d 1399, 1994 WL

---

17. The KFIA submits that plaintiffs' attack on the Forest Plan is actually an attack on the outstanding contracts to harvest timber in the Daniel Boone Forest and thus plaintiffs must exhaust the administrative remedies relevant to each individual contract. *See* 36 C.F.R. § 215.20 (1997). *See also*, 36 C.F.R. §§ 215.7, 215.11— 215.19 (1997). As plaintiffs failed to object to and appeal nine of the sales at issue, KFIA contends that plaintiffs are barred from contesting said sales in this Court. *See Glisson v. U.S. Forest Service*, 55 F.3d 1325 (7th Cir.1995); *Sharps v. U.S. Forest Service*, 28 F.3d 851 (8th Cir.1994). Furthermore, KFIA argues that plain-

tiffs are also prohibited from raising any issue in this Court which they failed to raise at the administrative level with respect to the remaining sales at bar, to-wit, all issues raised in the present action. *Id.*

Despite KFIA's arguments, the Court finds that this is simply a suit challenging the defendants' compliance with the ESA, the NEPA, and the NFMA. While the result of this action may affect individual contracts, it is not a suit specifically challenging each individual contract. Thus, the Court does not find KFIA's exhaustion argument meritorious.

666077 (9th Cir.1994). Because plaintiffs have complied with this single prerequisite and because defendants have failed to correct the alleged illegality despite the passage of an adequate amount of time to do so, the Court finds that it has jurisdiction over plaintiffs' ESA claims.

With respect to plaintiffs' NEPA claim, the Court opts not to address the exhaustion of administrative remedies issue as applied to said claim. As explained below, plaintiffs' NEPA claim is time barred by the applicable statute of limitations, thus rendering the exhaustion of administrative remedies issue moot.

 With respect to plaintiffs' remaining NFMA claim that defendants failed to properly adopt three policies as official amendments to the Forest Plan and that defendants are utilizing said amendments to manage the forest, the Court notes that prior to 1989, a declarative statement mandating affirmative action on the part of the challenger was absent from relevant regulations and statutes. See e.g., 36 C.F.R. § 211.18 (1985)(the 1985 regulations governing administrative appeals of the Forest Plan and the EIS at bar did not contain any express statement that a party must seek administrative review of a Forest Service final agency decision before challenging that decision in federal court). However, since 1989, relevant regulations have contained provisions making available administrative appeals a prerequisite to judicial review. See e.g., 36 C.F.R. § 217.18 (1989); 36 C.F.R. § 215.20 (1993). The policies which plaintiffs contend that defendants failed to properly amend to the Forest Plan, to-wit, the Cliffline Management Policy, the Shelterwood Policy, and the Indiana Bat Strategy, were promulgated in 1990, 1992, and 1996, respectively. At first blush, it is arguable that plaintiffs are bound by 36 C.F.R. § 217.18 (effective since 1989) to exhaust the administrative remedies available to them as related to defendants' alleged failure to properly amend the Forest Plan. However, upon closer consideration, the Court finds that plaintiffs are not bound

by 36 C.F.R. § 217.18, because plaintiffs do not challenge the amendment of the Forest Plan, as it was not clearly amended. In fact, according to plaintiffs, that is the crux of the problem. Plaintiffs seek to enjoin defendants from implementing said policies until the proper procedures for amending them to the Forest Plan are followed. For this alleged violation, the Court finds no administrative remedy. Hence, the Court finds that it has jurisdiction over plaintiffs' remaining NFMA claim.

### b. statute of limitations

Both federal defendants and KFIA raise the statute of limitations defense as a shield to plaintiffs' claims. Ergo, it is logically the next issue which the Court must consider before attending to the merits of plaintiffs' claims.

Applicable to the case at bar is the six-year statute of limitations for civil actions against the United States found at 28 U.S.C. § 2401 ("Except as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."). In order to properly analyze this defense, the Court must independently apply the statute of limitations argument to each of plaintiffs' claims, as they accrued at different times. Of course, the Court shall not dwell upon claims that it has previously found should be dismissed for various reasons grounded upon justiciability issues.

 First the Court turns to Count I, plaintiffs' assertion that defendants violated the ESA by failing to formally consult with Fish & Wildlife (1) when drafting the Forest Plan and the EIS, (2) when amending the Forest Plan nine times, (3) when adopting three policies, and (4) whenever a new species is listed on the threatened or endangered species list. Applying the "six-year deadline" to the facts at bar, the Court finds that because more than six years have passed since the adoption of the Forest Plan and the EIS in 1985, a final agency action for purposes of challenging the Forest Plan,[18]

18. In challenges brought pursuant to the APA, a plaintiff's right of action accrues at the time of

this Court does not have jurisdiction over plaintiffs' ESA challenge to the validity of the original Forest Plan. *See Sisseton–Wahpeton Sioux Tribe v. U.S.,* 895 F.2d 588, 592 (9th Cir.1990), *cert. denied,* 498 U.S. 824, 111 S.Ct. 75, 112 L.Ed.2d 48 (1990). *See also, Sierra Club v. Slater,* 120 F.3d at 631–32 (6th Cir.1997); *National Audubon Society v. Hoffman,* 917 F.Supp. 280, 286 n. 2 (D.Vt. 1995), *aff'd in relevant part,* 132 F.3d 7 (1997); *Sierra Club v. Robertson,* 810 F.Supp. 1021, 1026 n. 3 (W.D.Ark.1992), *aff'd in relevant part,* 28 F.3d 753 (8th Cir.1994). Second, the Court finds that plaintiffs' ESA challenge to the Forest Service's adoption of the first seven amendments to the Forest Plan are time barred as they occurred more than six years before the filing of the underlying complaint. However, the Red–Cockaded Woodpecker Plan and the Beaver Creek Gauging Station Removal Plan occurred within six years preceding the filing of plaintiffs' complaint, and thus plaintiffs are not time barred from pursuing their ESA claims as related to these two most recent plans. Third, with respect to plaintiffs' challenges to the three policies that defendants have adopted, the Cliffline Management Policy, the Shelterwood Policy, and the Indiana Bat Management Strategy, plaintiffs may only pursue their ESA claims related to the Shelterwood Policy and the Indiana Bat Management Strategy, which were adopted in the six years preceding the filing of the complaint. The Cliffline Management Policy was not adopted within six years from the date that plaintiffs filed their complaint and thus, plaintiffs may not pursue an ESA challenge based on this adoption. Fourth and finally, with respect to the eighteen (18) species which have been listed since the passage of the Forest Plan, only eight (8) species have been listed within the six years preceding the filing of plaintiffs' complaint, to-wit, Cumberland Rosemary, American Chaffseed, Northern Riffleshell, Clubshell, Palezone Shiner, Cumberland Combshell, Oyster mussel, and Cumberland Elktoe. Accordingly, plaintiffs may pursue their ESA claims related to these species.

the final agency action, which, with respect to challenges to the Forest Plan and the accompanying EIS, is the adoption of said documents.

■ With respect to plaintiffs' NEPA challenge, the Court finds that defendants' alleged failure to consider even-age management thirteen (13) years ago when drafting the Forest Plan and the accompanying EIS is time barred by the applicable statute of limitations herein referenced, as plaintiffs' claims are seven years late.

Turning to plaintiffs' remaining NFMA claim that defendants failed to properly amend the Forest Plan to include the three adopted policies from which the Forest Service is working, for reasons mentioned herein, the Court finds that plaintiffs' NFMA challenge related to the Cliffline Management Policy is time barred, but that plaintiffs may purse their NFMA claim related to the Shelterwood Policy and the Indiana Bat Management Strategy.

*c. laches*

■ "An environmental action may be barred by the equitable doctrine of laches if (1) there has been unreasonable delay in bringing suit, and (2) the party asserting the defense has been prejudiced by the delay." *Park County Resource Council, Inc. v. United States Department of Agriculture,* 817 F.2d 609, 617 (10th Cir.1987), *overruled in part by Village of Los Ranchos De Albuquerque v. Marsh,* 956 F.2d 970 (10th Cir.1992).

■ Applying this standard to the facts at bar relative to the claims remaining, the Court finds that the delay has not been unreasonable. Moreover, the Court finds that federal defendants are not prejudiced especially in light of the fact that they are drafting a new Forest Plan as this litigation progresses. Additionally, although the members of the KFIA may suffer some prejudice due to the loss of start-up costs for projects which may be halted, the Court finds that this is a foreseeable risk of doing business.

**B. Remaining Claims**

In light of the foregoing, plaintiffs may pursue the following claims in this Court:

*See Sierra Club v. Slater,* 120 F.3d 623, 631 (6th Cir.1997).

1) plaintiffs' ESA claims related to the federal defendants' alleged failure to formally consult with Fish & Wildlife (a) when defendants amended the Forest Plan to include Red–Cockaded Woodpecker Plan and the Beaver Creek Gauging Station Removal Plan; (b) when defendants adopted the Shelterwood Policy and the Indiana Bat Management Strategy; and (c) when the following new species were added to the endangered or threatened list, to-wit, Cumberland Rosemary, American Chaffseed, Northern Riffleshell, Clubshell, Palezone Shiner, Cumberland Combshell, Oyster Mussel, and Cumberland Elktoe; and

2) plaintiffs' NFMA claim related to federal defendants' failure to adopt the Shelterwood Policy and the Indiana Bat Management Strategy.

The following claims shall be dismissed for the previously cited reasons:

1) plaintiffs' ESA claim related to defendants' alleged failure to consult with Fish & Wildlife (a) when drafting the Forest Plan and the accompanying EIS; (b) the first seven (7) times that the Forest Plan was amended; (c) when adopting the Cliffline Management Policy; and (c) after 1985 when the first ten (10) of eighteen (18) new species were listed on the threatened of endangered species list;

2) plaintiffs' NEPA claims; and

3) plaintiffs' NFMA claim related to the Forest Plan's exclusive use of even-aged management.

## C. Plaintiffs' Motion for Injunctive Relief

Plaintiffs seek a preliminary injunction to enjoin "all on-going and planned timber harvesting activities in the Daniel Boone National Forest that 'may effect' endangered species and that were approved pursuant to the Forest Plan and pursuant to three illegally adopted policies known as the Shelterwood Policy, the Cliffline Management Policy, and the Indiana Bat Management Strategy." *Plaintiffs' Memorandum in Support of Their Motion for a Preliminary Injunction,* at ii.

### 1. Standard

As the moving party, plaintiffs bear the burden of establishing that the circumstances justify a preliminary injunction. *Granny Goose Foods Inc. v. Teamsters Local 70,* 415 U.S. 423, 441, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974).

When the ESA is involved in actions wherein injunctive relief is requested, courts are not bound to use the traditional equitable "balancing of harms" analysis. *See Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117; *Sierra Club v. Marsh,* 816 F.2d 1376, 1378, 1384–85 (9th Cir.1987). Thus, to determine whether injunctive relief shall issue, rather than applying the traditional four-part test for injunctive relief, the Court must simply ascertain whether there has been a violation of the ESA. If so, the Court must grant injunctive relief. *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 ("If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible").

To determine whether injunctive relief shall issue on plaintiffs' NFMA claim, the Court must apply the four-part traditional test. The four criteria which must be considered and balanced [19] when determining whether to issue a preliminary injunction are as follows:

1) whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits; 2) whether the plaintiffs have shown irreparable injury; 3) whether the issuance of a prelimi-

---

**19.** As a general matter, the four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied. These factors simply guide the discretion of the Court; they are not meant to be rigid and unbending requirements. Further, the district court's weighing and balancing of the equities of a particular case is overruled only in the rarest of cases. *McPherson v. Michigan High School Athletic Ass'n, Inc.,* 119 F.3d 453, 459 (6th Cir.1997).

nary injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuing a preliminary injunction. *Tyson Foods, Inc. v. McReynolds,* 865 F.2d 99, 101 (6th Cir.1989).

### 2. Analysis

 In reviewing the decisions of federal defendants, this Court employs the narrow "arbitrary and capricious" standard of review under the Administrative Procedure Act, 5 U.S.C. § 702 *et seq.*[20] The Court, limited solely to review what is contained in the administrative record,[21] must determine whether defendants' "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and therefore, was arbitrary and capricious. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on other grounds, Califano v. Sanders,* 430 U.S. at 105, 97 S.Ct. 980; *Friends of Fiery Gizzard v. Farmers Home Admin.,* 61 F.3d 501, 506 (6th Cir.1995). The Court is not empowered to substitute its judgment for that of the agency. *Id.* With that rule of law in mind, the Court does not seek to be a "Super Forest Service," however, it must act as a check on administrative decisions.

#### a. injunctive relief based on the ESA

 With respect to plaintiffs' ESA claims, from the statutory law cited herein and from the reading of *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1053 (9th Cir. 1994), *cert. denied* 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995)(enjoined the Forest Service from conducting any activity which may affect the protected salmon pending compliance with the ESA); *Lane County Audubon Soc. v. Jamison,* 958 F.2d 290, 294 (9th Cir.1992)(held, pursuant to the ESA, Bureau of Land Management must consult with Fish & Wildlife to obtain that agency's

biological opinion regarding the effects of the Strategy on the Northern Spotted Owl before implementing said Strategy and enjoined the award of any timber sales which had not been submitted to Fish & Wildlife); *Pacific Rivers Council v. Thomas,* 873 F.Supp. 365, 370 (D.Idaho 1995)(issued preliminary injunction against new and ongoing and announced activities pending completion of formal consultations); and *Silver v. Babbitt,* 924 F.Supp. 976, 983–84 (D.Ariz. 1995)(held consultation with Fish & Wildlife was necessary and "implementation of action prior to completion of consultation constitutes a violation of the ESA if the action constitutes irreversible or irretrievable commitment of resources."), the Court concludes that it may have been arbitrary and capricious for federal defendants not to have formally consulted with Fish & Wildlife (1) when they amended the Forest Plan to include the Beaver Creek Gauging Station Removal Plan; and (2) when defendants adopted the Shelterwood Policy and the Indiana Bat Management Strategy. Moreover, the Court concludes that it may have been arbitrary and capricious for the Forest Service not to have formally consulted with Fish & Wildlife when the following new species were added to the endangered or threatened list, to-wit, Cumberland Rosemary, American Chaffseed, Northern Riffleshell, Clubshell, Palezone Shiner, Cumberland Combshell, Oyster Mussel, and Cumberland Elktoe, given the statutory mandate set forth in 50 C.F.R. § 402.16. The Court sympathizes with the position in which Congress has placed the Forest Service, between a rock and a hard place. Balancing compliance with the environmental provisions and compliance with the multi-use provisions appears to be an insurmountable task, especially in light of the fact that Congress has placed the preservation of endangered and threatened species above all else. However, it is a task that Congress has mandated. Accordingly, the Court finds that it is appropriate to grant

---

20. Specifically, the Court must determine whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

21. *Florida Power and Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)(reviewing courts are limited to the administrative record). For this reason, the Court will not consider the documents that plaintiffs submitted to the Court which are not a part of the administrative record.

injunctive relief based on the Forest Service's violations of the ESA.

*b. injunctive relief based on the NFMA*

Turning to plaintiffs' NFMA claim, the Court analyzes each element of the four-part test in turn.

i. plaintiffs will succeed on the merits

 With respect to plaintiffs' NFMA claim related to federal defendants' failure to adopt the Shelterwood Policy and the Indiana Bat Management Strategy as official Forest Plan amendments, the Court finds that plaintiffs are as likely to succeed on the merits of this claim as they were in *House v. United States Forest Service,* 974 F.Supp. 1022, wherein this Court enjoined the Leatherwood Fork Sale, in part, because the defendants were implementing the policies they adopted but failed to properly amend to the Forest Plan. Hence, this factor weighs in favor of the plaintiffs.

ii. plaintiffs have shown irreparable injury

Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Amoco Production Co. v. Village of Gambell, AK,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). In the case at bar, the Court concludes that injury is likely, and thus the scales tip in favor of the plaintiffs with respect to this factor.

iii. the issuance of a preliminary injunction would not cause substantial harm to others

As the federal defendants have already begun the revision of the Forest Plan and have promised to formally consult with Fish & Wildlife in the drafting of said Plan and

have promised not to award any timber contracts until said Plan is completely revised, the Court finds that federal defendants will not be harmed by injunctive relief.

The persons represented by the KFIA will suffer some harm by the halting of the harvest, however, such harm is not substantial given that under the new Forest Plan, the same logging may go forward and new harvesting may be undertaken. Moreover, until the federal lands are available for timbering, loggers may seek out hardwoods on private lands, which according to recent statistics, are home to 95% of hardwoods in this region. The fact that loggers will not be "subsidized" [22] by the U.S. Forest Service while the federal agency fully complies with the applicable Congressional mandates, is not afforded much weight by the Court in its balancing of harms.

Hence, the Court finds this factor weighs in favor of the plaintiffs.

iv. the public interest would be served by issuing a preliminary injunction

Scientists are now able to document the existence and extinction of numerous species of plant and animal life from the Saber-Tooth Tiger to the fossilized remains of prehistoric plant life. Flora and fauna come and go; it is the nature of life. It is only in modern times that the extinction of a species, plant or animal, can be traced directly to the acts of man. Issuing an injunction would guarantee that the defendants' actions will not wipe out already endangered and threatened species. The Court finds that the greater good is served by preserving the habitats of the endangered and threatened species and thus preserving these species for generations to come.

*3. Conclusion*

In light of the foregoing, the Court shall grant plaintiffs' motion for preliminary injunction to the extent that plaintiffs moved

22. When it comes to obtaining logging contracts with the federal government, it appears that the free-market price-determining law of supply and demand does not apply. The situation is rather Keynsian, in that in general (1) prices for hardwoods are lower on federal lands than on private lands, and (2) loggers do not have to pay out of their own pockets to build logging roads. The combination of these factors usually yields a heftier profit for those loggers who timber on federal lands.

the Court to enjoin defendants from (1) utilizing the Shelterwood Policy and the Indiana Bat Management Strategy to structure the pending contracts at bar until Fish & Wildlife are consulted on said policies and the same are properly amended to the Forest Plan; (2) utilizing the Beaver Creek Gauging Station Removal Plan until consultation with Fish & Wildlife is complete on the same; (3) timbering in areas where the following endangered species are found, to-wit, Cumberland Rosemary, American Chaffseed, Northern Riffleshell, Clubshell, Palezone Shiner, Cumberland Combshell, Oyster Mussel, and Cumberland Elktoe, until Fish & Wildlife is consulted regarding the same.

## VII. SECURITY FOR ISSUANCE OF PRELIMINARY INJUNCTION

The Federal Rules of Civil Procedure provide:

> Security. No restraining order or preliminary injunctions shall issue except upon the giving of security by the applicant, in such sum as the Court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.

Fed.R.Civ.P. 65(c). The Court finds that a *de minimis* $100.00 cash bond is appropriate in the case at bar.

## VIII. ORDER

The Court, being otherwise fully and sufficiently advised, HEREBY ORDERS THAT:

1) defendants SHALL IMMEDIATELY TERMINATE TIMBERING ACTIVITIES DESCRIBED HEREIN,

 (a) pending formal consultation between the U.S. Forest Service and Fish & Wildlife regarding the Shelterwood Policy, the Indiana Bat Strategy, the Beaver Creek Gauging Station Removal Plan, and the following newly listed endangered species: Cumberland Rosemary, American Chaffseed, Northern Riffleshell, Clubshell, Palezone Shiner, Cumberland Combshell, Oyster mussel, and Cumberland Elktoe, and

 (b) pending the proper amendment of the Shelterwood Policy and the Indiana Bat Strategy to the Forest Plan or the adoption of a new plan incorporating the same;

2) plaintiffs shall forthwith post a bond in the amount of $100.00 cash no later than the close of business June 23, 1998.