## ILLINOIS STATE RIFLE ASSOCIATION, et al., Plaintiffs,

### v.

## STATE OF ILLINOIS, et al., Defendants.

### No. 89 C 2217.

United States District Court, N.D. Illinois, E.D.

Aug. 16, 1989.

James Valentino, Jr., Streamwood, Ill., for plaintiffs.

Neil F. Hartigan, Mary Ellen Coghlan, Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Illinois State Rifle Association ("Association"), Safari Club International ("Club"), Charles Wilt III ("Wilt") and Patricia Valentino ("Valentino")[1] have sued the State of Illinois and its Department of Conversation Director Mark Frech ("Frech"), claiming defendants have violated the Pittman-Robertson Wildlife Restoration Act ("Act"),[2] 16 U.S.C. §§ 669–669i.[3] Defendants have responded with a motion to dismiss under Fed.R.Civ.P. ("Rule")

---

1. Association and Club are Illinois not-for-profit corporations, professing to sue on behalf of their members and others who have purchased and own firearms, ammunition and sport fishing equipment, who pay taxes under 26 U.S.C. §§ 4161 and 4181 and who purchase hunting and fishing licenses and stamps from Illinois and the United States Department of Interior (Complaint ¶ 1). Wilt and Valentino claim to sue on their own behalf and as representatives of the same class as Association and Club, plus persons who purchase "migratory bird stamps, salmon stamps, and other taxes and license fees imposed upon hunters and fishermen" (Complaint ¶ 2). Defendants have attacked the sufficiency of the Complaint at the outset, before class certification could be addressed (more on this subject in n. 12).

2. Plaintiffs' Complaint, their Memorandum and the U.S.C.A. Historical Note following the Act all refer to the "Pitman–Robertson" Act, deleting the second "t" from the name of the Act's Senate sponsor, Nevada's Senator Pittman. It might be speculated that the mistake stems from counsel's confusion with the far better known Robinson–Patman Act (in a different area of the law), named in part after its House of Representatives sponsor, Congressman Patman.

3. All further citations to the Act (also known as the "Federal Aid in Wildlife Restoration Act") will take the form "Section ——," referring to the Title 16 numbering rather than the Act's internal numbering. All 50 C.F.R. references will simply read "Reg. § ——."

12(b)(6) on dual grounds—either of which would suffice for dismissal: [4]

    1. There is no private right of action to enforce the Act.

    2. This action is barred by the Eleventh Amendment.

For the first of those reasons, as discussed in this memorandum opinion and order, not only the Complaint but also the action itself are dismissed.

### Background[5]

Enacted in 1937, the Act is the principal mechanism for providing federal assistance to the States for wildlife restoration projects. Under Section 669b all tax revenues from the sale of bows and arrows (26 U.S.C. § 4161(b)) as well as pistols, revolvers, firearms, shells and cartridges (26 U.S.C. § 4181) are earmarked for a special wildlife restoration fund. After subtracting expenses (Section 669c), the Secretary of the Interior ("Secretary") apportions the funds to each State participating in the program (Section 669d).[6]

As with almost all federal programs, the money comes with strings attached. States can avail themselves of the benefits of the Act only by submitting comprehensive fish and wildlife resource management plans or wildlife-restoration projects (Section 669e(a)). Each State's proposals are subject to approval by the Secretary (*id.*).

Even more importantly for present purposes, no participating State may spend any funds apportioned to it (Section 669):

until its legislature, or other State agency authorized by the State constitution to make laws governing the conservation of wildlife, shall have assented to the provisions of this chapter and shall have passed laws for the conservation of wildlife which shall include a prohibition against the diversion of license fees paid by hunters for any other purpose than the administration of said State fish and game department.... The Secretary of the Interior and the State fish and game department of each State accepting the benefits of this chapter, shall agree upon the wildlife-restoration projects to be aided in such State under the terms of this chapter and all projects shall conform to the standards fixed by the Secretary of the Interior.

Consequently Section 669e(a) requires that any funds appropriated by Secretary for a wildlife plan or project be applied only to that plan or project. If funds are diverted, they must be replaced before the State may participate in further apportionment.[7]

For the past 50 years Illinois has expressly assented to the provisions of the Act (Ill.Rev.Stat. ch. 61, § 133). It also expressly prohibits the diversion of funds collected from state-imposed fees on hunting licenses (*id.* § 134). Illinois is therefore eligible for, and in fact does receive, federal funds for its wildlife projects.

Complaint ¶ 9 alleges, however, that Illinois has "diverted funds paid by plaintiffs

---

**4.** In the "Introduction" section of their opening memorandum, defendants also quarrel with plaintiffs' failure to clarify the nature of the asserted statutory violations of which they complain. In light of the conclusion reached in this opinion, there is no need to deal with those issues.

**5.** Rule 12(b)(6) principles require this Court to accept as true all plaintiffs' well-pleaded factual allegations, drawing all reasonable inferences in their favor (*Marmon Group, Inc. v. Rexnord, Inc.,* 822 F.2d 31, 34 (7th Cir.1987) (per curiam)). In this instance the Complaint contains few factual allegations at all. That poses no problem, however, because no factual disputes exist—instead, legal issues dominate this motion. Complaint references will take the form "Complaint ¶ —" or simply "¶ —."

**6.** Although the method of distributing the funds does not affect the resolution of the current motion, a brief digression outlining that method may be in order (Section 669c(a)):

    1. One-half is parceled out in accordance with the respective areas of the participating States.

    2. One-half is divided in proportion to the numbers of paid hunting-license holders in the participating States.

Each state's distribution is limited by Sections 669e(a)(1) and (a)(2) to permit its recovery of only 75 percent of its plan or project costs.

**7.** Section 669e(c) also limits a State's administrative costs (overhead or indirect costs for services) to 3 percent of the annual appropriation to the State.

and other such persons [putative class members] to purposes and projects that are not allowed under said act and that have no relationship to improving hunting, shooting or fishing," such as:

1. funds diverted from the Division of Natural Resources to the Division of Natural Heritage (¶ 9a);

2. funds used to purchase a Frank Lloyd Wright home in Springfield, Illinois (¶–9b); and

3. over $300,000 used to fund a ranch for prairie chickens—a non-huntable species in Illinois (¶ 9g).

Complaint ¶ 13 expresses plaintiffs' belief that Illinois has improperly diverted over $10 million in federal funds intended for wildlife restoration and another $30 million in Illinois license revenues.

### Lack of a Private Right of Action

Because neither the Act's language nor its legislative history reflects a congressional intent to allow private rights of action, this opinion can eschew anything other than a brief footnote analysis of defendants' contention that this action is barred by the Eleventh Amendment,[8] concentrating instead on the dispositive private-right-of-action issue. Both sets of litigants have missed the mark completely on the latter score. Although defendants do mention "private right of action" in a single sentence of their opening memorandum (D.Mem. 3–4), they attach it to the wrong statute—and even then they fail entirely to cite (much less discuss) the definitive Supreme Court case law in this area: *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) and its progeny. And plaintiffs' response (P.Mem. 3–6) is even farther off the mark. Even though discussion of the parties' submissions thus really adds nothing to the analysis, a brief detour may be in order simply to identify the wrongheaded arguments they have made.

As already stated, D.Mem. 3–4 devotes just one sentence to denying the existence of a private right of action. It cites two cases for the really irrelevant proposition that no private right of action exists to enforce the Fish and Wildlife Coordination Act ("Coordination Act"), 16 U.S.C. §§ 661–666c. To be sure, several courts have held no private right exists to enforce *that* statute (see, e.g., *Missouri Coalition for the Environment v. Corps of Engineers of the United States Army*, 678 F.Supp. 790, 803 (E.D.Mo.1988) and cases cited there). But plaintiffs have not sued under that statute

---

**8.** Both sides display a distressing lack of understanding of the most fundamental principles of Eleventh Amendment jurisprudence. It must be obvious to everyone but plaintiffs' counsel that the Complaint's prayer for an accounting and judgment for past diversions of funds is barred by that Amendment, while it must be obvious to everyone but defendants' counsel that the Complaint's prayer for an injunction against future diversions is not barred (see, e.g., *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) and *Quern v. Jordan*, 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979)). There is no excuse for such misuse of precedent as is evidenced by the Illinois Attorney General's misplaced reliance on *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)—that case, which precludes suits against States for violations of *State* law (not *federal* law), specifically reconfirms the *Edelman* principle immediately following the discussion on which the Attorney General mistakenly seeks to rely (see 465 U.S. at 102–03, 104 S.Ct. at 909). And there is equally no excuse for the garbled use of precedent by plaintiffs' counsel. Though any extended treatment of that topic would be both needless and nonproductive, one example is counsel's quotation from a District Court decision (one that somehow supposedly "limited" the Supreme Court's *Pennhurst* ruling!) that directly describes the *Edelman* holding—despite which counsel seeks to obtain retroactive money relief from the State in direct contravention of that holding. Such shallowness of perception on both sides is even less forgiveable in light of the facts that:

1. It is the everyday business of the Attorney General, as legal guardian of the State's purse strings, to call upon the Eleventh Amendment as a mainstay of that effort.

2. It is the business of every plaintiff's lawyer, given the mandate of Rule 11, to have done his or her homework before making a money or other claim against a State that could implicate the Eleventh Amendment.

3. Every lawyer ought to be aware that the Eleventh Amendment is one of today's major battlefields on which titanic struggles of conflicting basic principles are being fought (see most recently *Dellmuth v. Muth*, — U.S. —, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989)).

at all!! [9]

Plaintiffs are equally off base, though in a different direction. They mistake the wholly different question of their standing to sue (a status defendants have not challenged at all) for the real issue of whether any private party can bring an action under the Act. Of course, once the potential of a private cause of action has been established, a specific putative plaintiff must bring himself, herself or itself within the class that is entitled to bring such actions. But P.Mem. 3–6 has no business confronting that second-stage hurdle until plaintiffs have spoken (as they have not) to the first-level question of whether *any* private right of action exists to enforce the Act.

So much then for the litigants' submissions (or nonsubmissions). It is time to analyze the real issue.

What may be most notable about the Act (like Sherlock Holmes' reference to the dog that did not bark in the night) is the nearly complete absence of any case law discussing it. U.S.C.A. (both in its bound volume and in the 1989 pocket part) identifies only one case arising under the Act: *Udall v. Wisconsin,* 306 F.2d 790 (D.C.Cir.1962), analyzing the term "paid hunting-license holders." And in the course of its discussion of the Act, Bean at 220 confirms the paucity of such case law:

> Given the duration and magnitude of the Pitman–Robertson program and the widely divergent views of those interested in its administration, it is striking how little litigation there has been concerning it.

Unquestionably no *express* cause of action is conferred by the Act. That leaves plaintiffs in the difficult legal position of having to establish an *implied* right of action. On that subject *West Allis Memorial Hospital, Inc. v. Bowen,* 852 F.2d 251,

254 (7th Cir.1988) (citation omitted) has said succinctly:

> A strong presumption exists against the creation of such implied rights of action.

*West Allis* echoes the increasingly restrictive reading the Supreme Court has given to implied private actions—a much more demanding standard than *Cort v. Ash* was initially thought to have established. As *King v. Gibbs,* 876 F.2d 1275, 1280–81 (7th Cir.1989) (emphasis in original) has explained:

> The Supreme Court, in *Cort v. Ash,* set out a four-part test to determine whether a private right of action should be implied from a statute:
>
> > First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted," ...? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
>
> 422 U.S. at 78, 95 S.Ct. at 2089 (citations omitted).
>
> In its recent pronouncements, the Court has reaffirmed the use of the *Cort* test but has also made it clear that the principal focus is on the second of the *Cort* factors—whether the legislature intended to create a private cause of action. *See Cannon v. University of Chicago,* 441 U.S. 677 [99 S.Ct. 1946, 60 L.Ed.2d 560] (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568 [99 S.Ct. 2479, 2485, 61 L.Ed.2d 82] (1979). The first and third of the *Cort* factors are aids in

---

**9.** Not only did that statute antedate the Act by three years, but it is the immediate predecessor of the Act in the Title 16 codification (as a sidelight, see Bean, *The Evolution of National Wildlife Law* 181–95 (rev. ed. 1983) ("Bean") for an excellent discussion of the Coordination Act's various provisions and of some of the cases that have arisen under that statute). Because the

Complaint so specifically invokes the Act and not the Coordination Act, there can be no justification for defendants' blunder. Nor is their Reply Memorandum any better, for it repeats the very same mistake. It is thus a classic instance of the pot calling the kettle black for D.R.Mem. 5 to chide plaintiffs for making an argument "without support."

determining that intent, *Touche Ross,* 442 U.S. at 575–76 [99 S.Ct. at 2488–89]; *see also* P. Bator, D. Meltzer, P. Mishkin, D. Shapiro, *The Federal Courts and the Federal System,* 946 (1988), and, by negative implication, it is unclear whether the fourth *Cort* factor—whether the cause of action is generally thought of as a matter of state concern—has any continuing significance. *But see Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 393 [102 S.Ct. 1825, 1847, 72 L.Ed.2d 182] (1982) (Court noted that fourth *Cort* factor favored implying private right of action under a provision of the Commodities Exchange Act.). In sum, unless a congressional intent to create the right of action "can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist." *Northwest Airlines, Inc. v. Transport Workers Union,* 451 U.S. 77, 94 [101 S.Ct. 1571, 1582, 67 L.Ed.2d 750] (1981).

It is hardly surprising (given the lack of an express remedy) that nothing in the Act's language suggests a private right of action. And the legislative history (what little there is) is completely silent on the issue—it makes no mention of lawsuits of any kind. Indeed, the legislative history reflects only that the Act was designed to provide "grants-in-aid to the States for conservation purposes" (H.R.Rep. No. 1572, 75th Cong., 1st Sess. 2 (1937)). Congress reiterated that point in the course of its 1970 amendment to the Act, stating in S.Rep. No. 91–1289, 91st Cong., 2d Sess., reprinted in 1970 U.S.Code Cong. & Ad. News 4353, 4354:

The purpose of the legislation is to encourage comprehensive planning by the State fish and game departments, to increase the revenues available to the States for wildlife restoration projects, and to provide funds to be used by the States to carry out programs supporting hunter safety.

If in response to such encouragement a State elects to participate (as it is not compelled to do), it must of course comply with the Act's provisions. But the only statutorily-provided consequence of any State's failure to comply is that Secretary must withhold any future federal funds until the diverted funds are replaced (Section 669e(a)).[10] That limited statutory sanction itself creates a strong negative inference: It strongly suggests that a nonstatutory remedy such as a private enforcement action does *not* exist. Indeed, as n. 10 reflects, the Act does not even by its terms confer a right of action in *Secretary* to compel the restoration of any diverted funds (as contrasted with adopting the one-free-bite approach of barring a State's future participation so long as there are unreplaced funds of that nature).

In sum, plaintiffs must lose here—not so much because of any express showing that Congress did *not* intend to create a private action, but rather because nothing even hints affirmatively at the existence of any congressional intent to do so. No explicit consideration was given by Congress to the private-action question (as is often true of statutes passed well before the recent developments in the law of private actions). But such silence dooms plaintiffs here. They have tendered nothing to overcome *West Allis'* "strong presumption" against such implied rights of action. That ends the inquiry.[11]

**10.** Consistently with that statutory sanction, Reg. § 80.4(b) says the State is ineligible for further funds until the diverted funds are returned. Reg. § 80.21 allows Secretary to terminate or suspend State projects not in compliance with federal laws and regulations as well as to declare the State ineligible for future funding "until compliance is achieved"—it does not specifically provide for a suit even by Secretary to recapture previously-diverted funds.

**11.** Still another statute, the Federal Aid in Fish Restoration Act (also known as the Dingell–Johnson Sport Fish Restoration Act), 16 U.S.C. §§ 777–777*l*, contains provisions almost identical to those in the Act (see, e.g., S.Rep. No. 91–1289, 91st Cong., 2d Sess., reprinted in 1970 U.S.Code Cong. & Ad.News at 4356). Bean at 225–27 discusses the Dingell–Johnson Act and specifically notes (*id.* at 226):

Accordingly, the legal issues that might arise with respect to the Dingell–Johnson Act are much the same as those already discussed in

## CONCLUSION

Nothing in the language of the Act, its legislative history or its structure suggests Congress intended to create a private right of action for its enforcement. Accordingly this action must be and is dismissed for lack of subject matter jurisdiction.[12]

connection with the Pittman-Robertson Act. In fact, however, there has as yet been no reported litigation under the Dingell–Johnson Act.

Though plaintiffs did not themselves undertake any such research efforts in their own behalf, this Court searched for cases arising under that statute to see if any might shed light on the private right of action issue here. Again the search came up empty.

12. This Court is of course mindful of the Rule 23(c)(1) requirement for a prompt addressing of the class certification question, and its regular practice is to do so before turning to any other issues. In this instance three factors led it to do otherwise:

(a) At least one potential complicating factor for class action treatment appeared to jump out of the face of the Complaint—the identity of Valentino as a plaintiff and proposed class representative and of James Valentino, Jr. as plaintiffs' lawyer and proposed class counsel (see *Susman v. Lincoln American Corp.,* 561 F.2d 86, 90–96 (7th Cir.1977)). If counsel were to be disqualified from acting, the entire litigation would be delayed materially.

(b) Even apart from that factor, a time-consuming course of discovery and briefing is almost invariably required to deal with the interacting and often complex ingredients bearing on class certification. That too could spell substantial delay.

(c) Here the motion to dismiss was filed as defendants' opening move, and this Court viewed the Complaint as facially suspect in more than one respect that appeared incurable (an expectation that has proved entirely accurate).

Under those circumstances this Court elected to address the dispositive motion to dismiss first, though recognizing that such treatment gives defendants only such benefit (if any) as a District Court opinion on the merits may afford as a persuasive matter if another plaintiff chooses to sue, rather than the bar as to all class members that such a decision would provide if rendered after class certification (see, e.g., *Rutan v. Republican Party of Illinois,* 868 F.2d 943, 946–47 (7th Cir.1989) (en banc), explaining that in a situation such as this one only the named plaintiffs are bound by the decision). In any case, having chosen to move for dismissal, defendants cannot really complain about that possibility.