THE SIERRA CLUB, Ann Woiwode, Marvin Roberson, and Tim Flynn, Plaintiffs,

v.

UNITED STATES FISH AND WILD-LIFE SERVICE, William Hartwig, K.L. Cool, and Rebecca Humphries, Defendants.

No. 1:00–CV–762.

United States District Court,
W.D. Michigan,
Southern Division.

March 6, 2002.

Thomas C. Buchele, Pittsburgh, PA, for plaintiffs.

Robert I. Dodge, U.S. Attorney's Office, Grand Rapids, MI, for Department of Interior, Fish & Wildlife Service, William Hartwig, defendants.

Christopher D. Dobyns, Jennifer M. Granholm, Atty. Gen, Natural Resources Div., Lansing, MI, for Michigan Dept. of Natural Resources, Rebecca Humphries, K.L. Cool, defendants.

J. Kevin Winters, Michigan United Conservation Clubs, Lansing, MI, for Conservation Fund of America, Ruffed Grouse Society, Michigan United Conservation Club, National Wild Turkey Federation, Safari Club International, amicus.

Thomas M. Hitch, McGinty Jakubiak Frankland Hitch, et al., East Lansing, MI, for International Ass'n of Fish and Wildlife, amicus.

## OPINION

ENSLEN, District Judge.

This lawsuit is before the Court on the parties' cross-motions for summary judgment. This suit involves legal challenges to the federal and state governments' administration of certain wildlife grants in the State of Michigan. For the reasons which follow, summary judgment will be granted in favor of Defendants.

### FACTS

Plaintiffs are a private, not-for-profit conservation group and three individual residents of the State of Michigan. These Plaintiffs have brought this suit challenging the federal and state administration of four conservation grants (for the grant years of 1998 to 2002) made pursuant to the Federal Aid to Wildlife Restoration Act, 16 U.S.C. §§ 669 *et seq.*, commonly known as the Pittman–Robertson Act. The challenge is made under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A) on the grounds that the administrative action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." The administrative action is alleged to be "arbitrary and capricious" in light of the requirements of the Pittman–Robertson Act, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g), and the administrative

regulations and agency interpretations made under those Acts.

More particularly, Plaintiffs allege in Count One of their Amended Complaint that Defendants violated NEPA by segmenting their federal activities into four separate grant requests. Plaintiffs allege in Count Two that Defendants violated NEPA by utilizing a categorical exclusion as to the Operations and Management Grant. Plaintiffs allege in Count Three that Defendants violated NEPA by failing to prepare an environmental assessment or an environmental impact statement as to the continuation of the State habitat management activities, after discontinuing participation in the Habitat Management Grant, in the fall of 2000. Plaintiffs allege in Count Four that the USFWS and Defendant William Hartwig violated the ESA by failing to conduct section 7 consultations as to endangered species in connection with each of the four grants. Plaintiffs allege in Count Five that Defendants violated the Pittman–Robertson Act by inadequately specifying the activities to be done with funds granted for the Operations and Management Grant and the Habitat Management Grants. Plaintiffs have also made similar arguments as to their own Motion for Summary Judgment. (*See* Dkt. No. 70.) Defendants have each made a Cross–Motion for Summary Judgment relating to the allegations in Plaintiffs' Amended Complaint. (*See* Dkt. Nos. 77 and 79.) The Court has also received briefing from *Amici Curiae*, who are principally conservation groups, including hunting groups, who side with Defendants.

These Pittman–Robertson grants were made by the federal government after public administrative processes including notice and extensive citizen comment. For the years 1996 and 1997, Michigan received its Pittman–Robertson Act grant in the form of a single grant, named the Consolidated Statewide Habitat Management Grant. (Dkt. No. 77, Exhibit 1; Dkt. No. 86, Exhibit A.) The Consolidated Grant, which was also known as Grant 139–D, was $6,556,571.00 for 1996 and $6,200,079.00 for 1997. (*Id.*) Prior to the 1996 and 1997 grants, the State of Michigan had received separate grants to address specific wildlife restoration goals, some of which were based on specific geographical areas within Michigan. (*See* Dkt. No. 79 at 8; Exhibits B–F.) The Consolidated Grant proposals in 1996 and 1997 were done by Penney S. Melchoir of the Michigan Department of Natural Resources ("MDNR") at the urging of Rick Julian of the USFWS for the purpose of streamlining record-keeping. (Affidavit of Penney Melchoir at ¶¶ 3–7.)[1]

In 1997, the USFWS's staff changed and Brad Johnson of the USFWS (Regional Director of Region 3 of the USFWS) advised the MDNR to abandon the consolidated grant approach (which was then in the middle of a five-year grant authorization) in favor of separate grant applications based on separate chapters of the Federal Aid Handbook. (Melchoir Affidavit at ¶ 8. *See also* A.R. at 609, 614–619.) Thus, beginning in 1997, the MDNR applied for a five-year approval for several separate Pittman–Robertson grants, four of which are at issue in this suit: the Operations and Maintenance Grant (141–D Grant); the Hunting Access Grant (142–L Grant); the Planning Grant (143–P Grant); and the Habitat Management Grant (144–D Grant). (Dkt. No. 77, Exhibit 1; Dkt. No. 86, Exhibit A.) The total funds granted to the MDNR by the Department of Inte-

---

1. The suggestion by Plaintiffs, which is not supported by the record, that the grant proposals by the State were changed in 1997 to avoid NEPA requirements is illogical in that the agency did not alter its policy in applying the categorical exclusion to the Habitat Management Grant until 2000.

rior under the Pittman–Robertson Act between 1998 and 2002 has varied from year to year with a high in 2000 of $6,175,158.75 and a low of $3,629,263.00 in 2001. (*Id.*) Beginning with the 2001 grant year, the MDNR decided to discontinue seeking Pittman–Robertson Habitat Management Grants, *i.e.*, its funds used for habitat management purposes are derived solely from state funds. (*Id.*)

Of the four grant areas, the largest individual grant for each of the years between 1998 and 2002 has been the Operations and Maintenance Grant. (*Id.*) The Maintenance portion of the Grant covers funds to repair and upkeep 84 bridges, 77 buildings, 996 parking lots, 218 miles of roads and trails, 20,640 signs, 76 dams, 56 miles of dikes, 80 miles of ditches, 221 gates/tubes, 11 pumps, 1,060 nesting platforms and wildlife structures, and 8–12 public structures (including boardwalks, hunting blinds and observation platforms). (Administrative Record at 826–40.) These structures are existing wildlife structures as to which the State has a statutory duty to maintain as part of its participation in the Pittman–Robertson Program. *See* 16 U.S.C. § 669g. The Operations activities funded by the Grant cover trash cleanup of approximately 400,000 acres, boundary surveys, a natural features inventory review, employee training and distribution of public information. (A.R. at 826–40; Dkt. No. 77, Exhibit 1.) The MDNR made the five-year grant proposal, for the period of November 7, 1997 until September 30, 2002, for the Operations and Maintenance Grant, Grant 141–D, dated November 7, 1997, which was approved by the USFWS on November 25, 1997. (A.R. at 826, 829–867.) Thereafter, the USFWS and the MDNR on a yearly basis entered into a series of agreements describing their obli-gations for each of the grant years. (A.R. 907–1001.) Because the activities covered by Grant 141–D were almost exclusively in the nature of ongoing maintenance of existing structures and trash cleanup activities, the USFWS and MDNR indicated in their grant paperwork that the agency activity was categorically excluded under categorical exclusion 1.4(B)(2) of the Forest Service Manual (A.R. at 3831) from requirements under NEPA of performing an environmental assessment or preparing an environmental impact statement. (A.R. at 839 and 867.) The grant paperwork also contained Section 7 materials relating to consultation about the effects on endangered species and both the MDNR and USFWS concurred that there would be no adverse impacts on endangered species and that formal consultation was unnecessary. (A.R. 838, 862–63, 872–73; *see also* Dkt. No. 77, Exhibits 3.) [2]

Grant 142–L, the Hunting Access Grant, was, in terms of dollars allocated, a small fraction of the size of the Operations and Planning Grant. (Dkt. No. 77, Exhibit 1; Dkt No. 86, Exhibit A.) The Hunting Grant between 1998 and 2002 varied from a low in 1998 of $176,250 to a high of $203,375 in 2000. (*Id.*) The Hunting Grant is used to lease private lands for hunting, information distribution, program administration, and hunting tags and signs. (A.R. at 1027–1031, 1065–67.) The Hunting Grant results, on a yearly basis, in the lease of an estimated 120,000 acres a year for hunting. (A.R. at 1068.) The five-year Hunting Access Grant was approved on November 25, 1997. (A.R. at 1061–63.) Grant agreements were then approved by the parties on a yearly basis for the pertinent grant years. (A.R. at 1144–48, 1163–1171, 1224–30, 1263–70.) The MDNR clas-

---

**2.** Exhibits 3–5 of Dkt. No. 77 are the most pertinent documents relating to ESA compliance in that they relate to the current grant year (2002). Consideration of elapsed grant years is, for the most part, a moot and purely academic exercise.

sified this activity as categorically excluded under Forest Service Manual section 1.4(B)(7) because the project involved "minor" changes in land use of state managed lands (*i.e.*, leasing for hunting of traditionally hunted areas). (A.R. at 1068.) The USFWS agreed with the MDNR that the Grant was categorically excluded from NEPA assessment and that the activities would have no negative effects on endangered species. (A.R. at 1120–28; *see also* Dkt. No. 77, Exhibit 5.)

Grant 143–P, the Planning Grant, was, in terms of the dollars allocated, a small fraction of the Operations and Planning Grant, but was larger than the Hunting Access Grant. (Dkt. No. 77, Exhibit 1; Dkt. No. 86, Exhibit A.) The dollars allocated yearly varied from a low in 1998 of $75,000 to a high in 2002 of $497,232 and the amounts allocated have increased for each successive grant year. (*Id.*) The grant was proposed and granted for the purpose of allowing Michigan to do its ecosystem planning on a state-wide basis (as opposed to doing uncoordinated ecosystem plans of separate geographical areas) and to make minor revisions in planning in connection with the coordinated planning. (A.R. at 1365–1463.) This project is intended to not only add coordination in planning, but also to include citizens and other governmental agencies in the planning process. (*See* Dkt. No. 79, Exhibit H.) The Grant includes specific activities for the development of policies and procedures for ecosystem management, the development of a new ecosystem planning process with public comment, and the development of an integrated resource inventory system. (A.R. at 1365–1463.) The Grant does not fund any resource management activities which might be suggested by the ecosystem planning. (A.R. at 1511–12.) The Grant was approved by the USFWS without either an environmental impact statement or environmental assessment because the USFWS deemed this a planning activity categorically excluded from NEPA under categorical exclusions 1.4(B)(9) and (10). (A.R. at 1474.) Similarly, the USFWS determined, consistent with the determination of the MDNR, that these planning activities were not likely to adversely affect endangered species and that formal section 7 consultation was unnecessary. (A.R. at 1467–68; *see also* Dkt. No. 77, Exhibit 4.) Following the approval of the Grant, the USFWS and the MDNR executed agreements on a yearly basis as to their grant obligations. (A.R. at 1517–1568.)

Grant 144–D, the Habitat Management Grant, was a larger grant on the scale of approximately one-half of the size of the Operations and Maintenance Grant. (Dkt. No. 77, Exhibit 1; Dkt. No. 86, Exhibit A.) The Habitat Grant ranged between a low of $492,750 in 1998 and a high of $1,493,562.75 in 2000. The MDNR did not come to an agreement with the USFWS for a grant in either 2001 or 2002. When the USFWS determined that further funding of the grant for 2001 and 2002 would not be subject to a categorical exclusion from NEPA, A.R. at 1862–63, *see also* A.R.2016–2113, the MDNR decided to not accept federal funds and to conduct habitat grant activities solely with state funds. The Grant was originally proposed and approved for the purpose of implementing habitat management practices on the State's 400,000 acres of wildlife management area. (A.R. at 1078.) These practices included tree planting, wildlife food and cover planting, mowing and burning, tree harvesting and water manipulation of wetlands. (A.R. at 1676–77.) The USFWS determined in 1997 that the Grant qualified for a categorical exclusion from NEPA. (A.R. at 81, 1716–20.) It also determined in 1997 that formal section 7 consultation was not required. (*Id.*)

### STANDARDS FOR SUMMARY JUDGMENT

These motions are brought under Federal Rule of Civil Procedure 56. Under the language of Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If, after adequate time for discovery on material matters at issue, the non-movant fails to make a showing sufficient to establish the existence of a material disputed fact, summary judgment is appropriate. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions. *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir.1994). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548 (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). The factual record presented must be interpreted in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

██ Furthermore, in a case such as this one, where the subject of the action is contained in and defined by the Administrative Record, the parties' motions for summary judgment may be promptly decided with little or no discovery, which is unnecessary in light of the Administrative Record. *See Davidson v. United States Dept. of Energy*, 838 F.2d 850, 855 (6th Cir.1988) (holding that APA review is limited to administrative record); *Sierra Club v. Slater*, 120 F.3d 623, 638–39 (6th Cir. 1997) (same). Moreover, because a case such as this asks whether an administrative decision is proper in light of an established record, it is usually an apt candidate for summary judgment, regardless of how the issue is determined. *Florida Fruit & Vegetable Ass'n v. Brock*, 771 F.2d 1455, 1459 (11th Cir.1985).

### LEGAL ANALYSIS

#### A. Legal Standards

██ Plaintiffs plead their claims under NEPA, the Pittman–Robertson Act, the ESA and the APA. NEPA is a environmental statute with procedural purposes: to ensure that federal agencies and state agencies acting with federal money consider significant environmental impacts of any proposed action, and to assure the public that the agency considered those concerns as part of its decision-making process. *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). However, NEPA itself does not provide a private right of action. *Sierra Club v. Slater*, 120 F.3d 623, 630 (6th Cir.1997); *Sierra Club v. Penfold*, 857 F.2d 1307, 1315 (9th Cir.1988). Therefore, Plaintiffs' NEPA claims must be analyzed under the APA, 5 U.S.C. § 706, to enforce the procedural provisions of NEPA. *Id.*

██ Under the APA, Plaintiffs are required to show that the Defendants' non-

compliance with NEPA is sufficiently clear so as to constitute conduct which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Sierra Club,* 120 F.3d at 632. In applying these standards, an agency's interpretations of statutory language is entitled to deference unless it is plainly not a legitimate construction of the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Friends of the Crystal River v. United States Environmental Protection Agency,* 35 F.3d 1073, (6th Cir.1994). Furthermore, even greater deference is owed to an agency's interpretations of its own regulations, which must be upheld unless only they are plainly erroneous. *Lewis v. Babbitt,* 998 F.2d 880 (10th Cir.1993).

The Pittman–Robertson Act is a unique piece of federal legislation, authored in 1937, for the purpose of providing states with financial assistance for wildlife restoration projects. The Act does so by imposing an excise tax on the sale of firearms, ammunition and archery equipment and then allocates the money, minus a reduction for expenses, to the participating states for use in wildlife restoration projects. *See* 16 U.S.C. § 669 *et seq.;* 26 U.S.C. §§ 4161(b) and 4181; *Illinois State Rifle Ass'n v. State of Illinois,* 717 F.Supp. 634, 637 (N.D.Ill.1989). The Act has been implemented by the participating states proposing for federal approval five-year grant proposals, which must comply with all pertinent federal environmental laws including NEPA and section 7 of the ESA. *See Fund for Animals v. Babbitt,* 89 F.3d 128, 130 (2nd Cir.1996).

■ The Pittman–Robertson Act is rarely litigated, even in federal court, and contains no suggestion that it intended the creation of a private cause of action. It was interpreted in *Illinois State Rifle Ass'n* as not creating a private cause of action. *See Illinois State Rifle Ass'n,* 717 F.Supp. at 637. Nevertheless, since the participating states and their citizens have a strong interest in ensuring that grant monies are not misdirected, federal courts have allowed suits to enjoin the misdirecting of funds as well as to enforce the assumed environmental requirements of a grant. *See, e.g., Sportsmen's Wildlife Defense Fund v. Romer,* 29 F.Supp.2d 1199 (D.Colo.1998), *Sportsmen's Wildlife Defense Fund v. United States Dept. of the Interior,* 40 F.Supp.2d 1192, 1199 (D.Colo. 1999). In this case, Plaintiffs in their Amended Complaint take the position that compliance with the Pittman–Robertson Act, like NEPA compliance, is to be assessed under the APA. This is a reasonable position given the failure of the statute to provide any direct cause of action and given the Sixth Circuit Court of Appeals' treatment of NEPA claims. Thus, the Court will assess Plaintiffs' Count Five under the APA standards.

■ Section 7 of the ESA, codified at 16 U.S.C. § 1536, requires federal agencies to consult with the USFWS about proposed federal action which might adversely impact protected species or their habitats. The purpose of this requirement is to allow federal agencies to benefit from the expertise of the USFWS (or the National Marine Fisheries Service) in assessing the environmental impact of proposed action on protected species and the feasibility of alternative plans. *Lone Rock Timber Co. v. United States Department of Interior,* 842 F.Supp. 433, 440 (D.Or. 1994). When the proposed action is by the USFWS itself, it is still required to conduct an "intra-agency consultation." *Environmental Protection Information Center, Inc. v. Pacific Lumber Co.,* 67 F.Supp.2d 1113, 1121 (N.D.Cal.1999); *Log-*

*gerhead Turtle v. County Council of Volusia County, Fla.*, 120 F.Supp.2d 1005, 1012–1013 (M.D.Fla.2000); *Greenpeace Foundation v. Daley*, 122 F.Supp.2d 1110, 1118 (D.Hawai'i 2000).

The procedural workings of section 7 were described in the case of *Kentucky Heartwood, Inc. v. Worthington*, 20 F.Supp.2d 1076, 1084 (E.D.Ky.1998) as follows:

> An agency proposing an action must first determine whether the action "may affect" listed species. 16 U.S.C. § 1536; 50 C.F.R. §§ 402.11 and 402.14. How this determination is made is left up to the agency. [If an agency determines that its actions have "no effect" on protected species and their habitats, then consultation is not required. *See* 50 C.F.R. § 402.14(a).] If an agency determines that its actions "may affect" a protected species or its habitat, then that agency must enter into consultation with Fish & Wildlife to ensure that the proposed actions are not likely to jeopardize the continued existence of any listed species. 50 C.F.R. § 402.14. There are two forms of consultations: formal and informal. The agency may either enter into formal consultation with Fish & Wildlife or engage in informal consultation to determine whether formal consultation is appropriate or necessary. 50 C.F.R. §§ 402.13, 402.14(a), (b). If during informal consultation, the agency and Fish & Wildlife concur in writing that the proposed action is "not likely to adversely affect" a protected species, then the consultation process is complete and formal consultation is unnecessary. *Id.* Additionally, if it is agreed that the action will not adversely affect a protected species, then

> Fish & Wildlife does not have to prepare a biological opinion. On the other hand, if, during informal consultation, the agency determines that its actions may have an adverse effect on a protected species, then the agency must request initiation of formal consultation with Fish & Wildlife. Moreover, if formal consultation is required, then a biological opinion by Fish & Wildlife is required to advise the agency whether jeopardy is likely to occur and, if so, whether reasonable and prudent alternatives exist to avoid a "jeopardy" situation.

*Id.* at 1084 (footnotes omitted). *See also Bennett v. Spear*, 520 U.S. 154, 159, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

In this case, the process for "consultation" was slightly different from that discussed in the *Kentucky Heartwood* case because this case involved "intra-agency" consultation under the procedures adopted for Region 3 of the USFWS.[3] (*See* A.R. at 2637–2642, specifying intra-agency procedure for Region 3.) The enforcement of ESA procedures by injunctions, divorced from the traditional standards for equity, has been upheld by the United States Supreme Court given the statute and the strong interests in protecting endangered species and their habitat. *See Tennessee Valley Authority v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978); *Sierra Club v. Marsh*, 816 F.2d 1376, 1378, 1384–85 (9th Cir.1987). Since section 7 compliance is a procedural matter, Plaintiffs have taken the position, with the agreement of Defendants, that section 7 compliance is subject to the standard for review applicable under the APA. This Court concurs in that assessment.

---

**3.** Given the lack of statutory guidance on intra-agency consultation, the Court must, in this case, defer to the agency's judgment that the consultation procedures adopted were sufficient to fulfill the purposes of the ESA. There is no strong suggestion in the record to the contrary.

### B. Mootness

Of course, Article III of the United States Constitution limits the jurisdiction of federal courts to actual "cases" and "controversies." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Hodges v. Schlinkert Sports Associates*, 89 F.3d 310, 312 (6th Cir.1996). Thus, a threshold question in every federal suit is whether the court has the judicial power to entertain the suit. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The "case" and "controversy" requirement encompasses the separate doctrines of standing, justiciability and mootness. *National Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 279–80 (6th Cir.1997).

According to the Sixth Circuit Court of Appeals, "The test for mootness 'is whether the relief sought would, if granted, make a difference to the legal interests of the parties....'" *McPherson v. Michigan High School Athletic Ass'n, Inc.*, 119 F.3d 453, 458 ( 6th Cir.1997) (quoting *Crane v. Indiana High Sch. Athletic Ass'n*, 975 F.2d 1315, 1318 (7th Cir.1992)). The Sixth Circuit Court of Appeals has recently said the following about mootness inquiries:

> A federal court has no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue. *Church of Scientology v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992). A case becomes moot " 'when the issues presented are no longer "live" or parties lack a legally cognizable interest in the outcome.'" *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). In other words, a case becomes moot only when subsequent events make it absolutely clear that the allegedly wrongful behavior cannot reasonably be expected to recur and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.* The heavy burden of demonstrating mootness rests on the party claiming mootness. *Id.*

*Cleveland Branch, N.A.A.C.P. v. City of Parma, OH*, 263 F.3d 513, 530–31 (6th Cir.2001). *See also Chamber of Commerce v. United States Dept. of Energy*, 627 F.2d 289, 291 (D.C.Cir.1980) (discussing prudential mootness doctrine); *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir.1997) (same); *Chang v. Tennessee Valley Authority*, 82 F.Supp.2d 817 (E.D.Tenn.2000) (same).

While decisions like the *Cleveland Branch* case view mootness inquiries with a healthy skepticism, it remains true that federal courts cannot issue declaratory or injunctive relief as to moot cases. The instant case, inasmuch as it concerns the Habitat Management Grant, is moot precisely because this Court can issue no relief which would affect the legal interests of the parties. Plaintiffs have argued, based on cases about termination of federal projects midstream for the purpose of avoiding environmental oversight, that the use of state funds to continue the controversial practices makes the challenged activity "federal action" subject to federal regulation. *See Ross v. Federal Highway Admin.*, 162 F.3d 1046, 1052–53 (10th Cir. 1998); *Scottsdale Mall v. Indiana*, 549 F.2d 484, 488 (7th Cir.1977).

Plaintiffs' argument, however, misapprehends the legal structure for the Pittman–Robertson Grants. Under the legal structure, the five-year planning process is a precursor to individual one-year agreements. The five-year planning process does not obligate either the federal government or the state government to act or

dispense funds. Rather, the federal government's obligation to dispense funds arises from the yearly grant agreement, 50 C.F.R. § 80.08, and the State's obligation to carry out grant work arises from the yearly grant agreement, USFWS Manual, 522 FW 1.6 (A.R at 3563). Thus, in the instant case, unlike the partially completed federal project cases cited, there was no "termination of a partially completed federal project." Also, this case is very distinguishable from the *Ross* and *Scottsdale* cases in that it does not involve the continued building of a physical structure, but rather yearly forest maintenance activities which the State must re-visit on a regular basis regardless of the extent of past federal funding and regardless of the extent of past maintenance activities.[4]

▮ Furthermore, the mere fact that the other three grants have continued through 2002 does not render the challenge to the Habitat Management Grant a live controversy. While it is true that federal NEPA regulations outlaw "segmentation" of federal action in evaluating environmental concerns, the "segmentation" argument here is a red herring.

The pertinent standard for segmentation is stated in federal regulation as follows:

Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements [or]

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously [or]

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25. *Compare Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir.1985); *Trout Unlimited v. Morton*, 509 F.2d 1276 (9th Cir.1974); *Hirt v. Richardson*, 127 F.Supp.2d 833, 842 (W.D.Mich.1999).

In this case, the agency's interpretation of the segmentation regulations (including the manner of proposing these grants) was not "arbitrary and capricious." Indeed, it seems the best reading of the segmentation regulations. The four grant areas at issue each relate to separate wildlife restoration activities of the State. There is no compelling logic for combining consideration of forestry activities in Northern Michigan with hunting activities in lower Michigan or either state-wide maintenance and cleanup activities or state-wide coordination of regional planning activities. Also, historically, these grants were made separately and they were not proposed in the disjunctive in 1997 for the purpose of evading any environmental review. Accordingly, the Court determines that there was no "segmentation" of the grants and that all the legal challenges to the Habitat Maintenance Grant are moot since any declaratory or injunctive relief ordered would not affect the legal interests of the parties.[5]

### C. Standing

▮ Having resolved the mootness question, the Court must now address the issue of whether the named Plaintiffs have standing to challenge the remaining three grants. The three individual named Plaintiffs and Bruce Van Otteren, another member of the Sierra Club, filed Declarations on May 17, 2001 specifying their aesthetic

4. As may be inferred from the recitation of facts herein, the Court rejects Plaintiffs' "shell game" argument that the Defendants are in fact using the other WRA funds for continued habitat management activities. The Administrative Record refutes, rather than supports, this argument.

5. The concept of "prudential mootness" and cases cited relating to that rubric also support a conclusion of mootness as to the Habitat Maintenance Grant.

injuries caused by the challenged activities. (*See* Declarations of Woiwode, Robertson, Van Otteren and Flynn.) [6] Each of these Declarations (as well as the later Supplemental Declarations) describes two kinds of injuries: aesthetic injuries, *i.e.*, potential effects on wildlife and plants which Plaintiffs wish to observe and which they believe are caused by aggressive cutting of timber and game management practices which focus on game species to the detriment of non-game species; and informational injuries caused by summary treatment of NEPA, ESA and Pittman–Robertson Act requirements.

The most pertinent statement of the Supreme Court's standing test comes from the environmental case of *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992):

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted); *see also TCG Detroit v. City of Dearborn,* 206 F.3d 618, 622 (6th Cir.2000); *Nat'l Rifle*

*Ass'n of Am. v. Magaw,* 132 F.3d 272, 279 (6th Cir.1997).

It is clear from the case law that aesthetic injuries do constitute a concrete and particularized injury in environmental cases. However, the problem here is one of cause and redressability. The overpopulation of deer and the adverse effects on wildlife and plants mentioned by the Plaintiffs all flow, if at all, from the habitat management activities and not the other grant activities. Certainly, coordinated planning, which Plaintiffs favor, does not give rise to these injuries; nor does hunting of deer on private lands in Southern Michigan; nor does the upkeep and cleanup of designated wildlife areas. Accordingly, Plaintiffs cannot establish standing based on their asserted aesthetic interests as to the Planning, Hunting and Operations and Maintenance Grants.

Whether informational injuries, in environmental cases, are sufficient to confer Article III standing is a very interesting question which the United States Supreme Court and the Sixth Circuit Court of Appeals have deftly avoided. This District, following the holding in *Foundation on Economic Trends v. Lyng,* 943 F.2d 79 (D.C.Cir.1991), has held that informational injuries are insufficient in this context to support Article III standing. *Heartwood, Inc. v. U.S. Forest Service,* 2001 WL 1699203, at *9–10 (W.D.Mich.2001). Judge Quist's reasoning in that case, like the reasoning of the District of Columbia Circuit Court, is both persuasive and apt in this matter. Accordingly, the Court determines as a matter of law that Plaintiffs lack standing to challenge the Planning,

---

**6.** Plaintiffs, in the briefing of the summary judgment motions, also submitted the Supplemental Declarations of Roberson and Woiwode, which were worded in part to refer to grants other than the Habitat Management Grants. However, in the judgment of this Court, these Supplementary Declarations, at least in reference to the other grants, are conclusory in nature and fail to establish constitutional standing as to the other grant activities.

Hunting, and Operations and Maintenance Grants.[7]

### D. Remaining Issues

The Court's resolution of the above issues makes any further findings unnecessary. Nevertheless, for the purpose of providing a complete record for appeal, the Court does determine that the Defendants prevail on each of the remaining issues in that Plaintiffs cannot show on the present record "arbitrary and capricious" conduct by Defendants under NEPA, the ESA or the Pittman–Robertson Act. These conclusions follow from the argument of Defendants and *Amici Curiae*, which the Court approves and adopts here by reference.

### CONCLUSION

Accordingly, a Judgment shall issue granting summary judgment to the Defendants.

### JUDGMENT

In accordance with the Opinion of this date;

**IT IS HEREBY ORDERED** that Plaintiffs the Sierra Club, Ann Woiwode, Marvin Roberson and Tim Flynn's Motion for Summary Judgment (Dkt. No. 70) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants the United States Department of the Interior, the United States Fish and Wildlife Service, and William Hartwig's Cross–Motion for Summary Judgment (Dkt. No. 77) is **GRANTED** and judgment

is entered in their favor as to all of Plaintiffs' claims against them.

**IT IS FURTHER ORDERED** that Defendants K.L. Cool and Rebecca Humphries' Cross–Motion for Summary Judgment (Dkt. No. 79) is **GRANTED** and judgment is entered in their favor as to all of Plaintiffs' claims against them.

---

7. Plaintiffs have argued that the Supreme Court's decision in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC)*, 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) establishes that an individual may have standing despite that it cannot be shown that a violation of the environmental laws has negative environmental effects. This is true enough in that, as in the *Laidlaw* case, the challenged activities under the Clean Water Act caused the plaintiffs to discontinue use of recreational waters due to safety concerns, which clearly provided them with standing. In this case, however, the record does not support a conclusion that the challenged activities with respect to the other grants have impaired Plaintiffs' aesthetic interests respecting the wildlife areas pertinent to the grant activities.